CREST CONTAINER CORPORATION, Plaintiff-Appellee, *v.* R. H. BISHOP COMPANY, Defendant and Third-Party Plaintiff-Appellant.—(Fedders Corporation, Climatrol Division, Third-Party Defendant-Appellee.)

Fifth District No. 81—604

Opinion filed December 21, 1982.

Harrington, Porter & Pope, of Champaign, for appellant.

Franklin E. Dove, of Dove & Dove, of Shelbyville, for appellee Crest Container Corporation.

John P. Ewart and Michael D. Gifford, both of Craig & Craig, of Mattoon, for appellee Fedders Corporation, Climatrol Division.

JUSTICE KARNS delivered the opinion of the court:

Plaintiff, Crest Container Corporation, commenced this action against defendant and third-party plaintiff R. H. Bishop Company to recover damages for breach of contract. Bishop filed a third-party complaint against Fedders Corporation, Climatrol Division, alleging breach of warranties. The circuit court of Shelby County entered judgment in favor of Crest on a jury verdict and allowed Fedders' motion for directed verdict made at the close of Bishop's case. Bishop appeals from both decisions of the trial court.

This case arises from the design and installation of a commercial heating system. In 1974, Crest Container Corporation constructed a new building at their plant location near Shelbyville. The general contractor was Northeast Construction Managers. R. H. Bishop was a subcontractor employed to do plumbing, heating and air conditioning. Bishop designed the heating system based on general specifications and a performance plan developed by Crest. The system consisted of a boiler and insulated piping that carried steam to 13 separate heating units located throughout the building. Each unit contained copper coils manufactured by Fedders-Climatrol.

The system became functional by the fall of 1974. Almost immediately, Crest experienced problems with the system. It did not heat adequately and several of the heating units leaked. It also developed water hammer, described as accumulated water in the coils slamming against obstructions in the system. In accordance with its one-year warranty, Bishop made numerous repairs to the units during the 1974-75 heating season. Almost as soon as repair was accomplished, new leaks were discovered. At one point the units were modified by placing a flat stainless steel disc or pancake at one opening of the unit so that steam could not enter the unit on both sides. The system did

produce more heat after the modification but Crest continued to experience leaks. The leaks and the repairs continued throughout the 1975-76 heating season. Finally, on May 25, 1976, Bishop, Crest and Northeast Construction Managers entered into a supplemental agreement. It required Bishop to make specific modifications to the system as recommended by Crest's consultant; it further required Bishop to hydrostatically test all coils, repairing and replacing as necessary to meet the minimum requirements of the test. Bishop warranted the coils against defects, faulty workmanship and leaks for the 1976-77 heating season. It further warranted to repair any leaks that developed during 1976-77 for another heating season. Crest and Northeast Construction covenanted not to sue Bishop for problems to be remedied by the agreement, excepting any violations of the agreement.

Bishop completed the tests and performed repairs in early fall, 1976. In December, Les Bracken, Crest's plant manager, called Bishop's president, Charles Amacher. Bracken explained that the coils continued to leak and that repairs were no longer being made. Amacher replied that his company had already spent too much money and that they weren't going to make further repairs. In January of 1977, Amacher called to tell Bracken that he was going to bring an expert with him to the plant to check the system. It was Amacher's belief that Crest may have been partly responsible for the problem. Bracken, on advice of corporate counsel, told Amacher he could come only if he brought a letter of intention that he was there to remedy the leaking problems but could not come on a "fishing expedition." Amacher stated that no one would come and no more repairs were made.

Crest proceeded to have the system replaced by another contractor, Burdick Plumbing & Heating Company. The system was replaced during the summer of 1978. Crest has not experienced leaking problems since the replacement.

Crest incurred damages for the replacement of the heating system, for water damage to inventory stored at the plant and for labor for plant cleanup. The jury returned a verdict for Crest and awarded damages in the amount of $34,466.

■ Bishop contends that the verdict is against the manifest weight of the evidence. Bishop's argument is essentially that the jury's verdict was excessive. Bishop argues that the maximum amount for which it can be held liable is the cost of the replacement of the coils. Amacher testified that all work necessary to replace the coils would cost $17,525. Crest's proof of damages was invoices paid by Crest to Burdick. Those invoices included costs for increasing trap

sizes, increasing coil capacity, increasing supply lines, installing air vents, and installing vacuum breakers. Bishop argues this additional work constitutes a renovation of the system and is outside the scope of Bishop's liability according to the May supplemental agreement.

We disagree. When the agreement is read as a whole, it is clear that its purpose was to ensure that Crest had an efficient, functioning heating system. Although Burdick's invoices included work beyond simple replacement of the coils, there was evidence from which the jury could conclude that the system would not operate as warranted without the additional modifications. We also note that Crest was careful to deduct from the Burdick invoices the expense of installing humidifiers and control valves which are separate from the heating system. Crest was also required to deduct changes made in the piping system as Crest had accepted this system under the terms of the May agreement. The jury verdict was supported by the evidence, and the judgment in favor of Crest for $34,466 is affirmed.

Bishop also appeals from the trial court's allowance of Fedders-Climatrol's directed verdict.

In 1974, Mueller Climatrol Corporation was bought by Fedders Corporation and became a wholly owned subsidiary. At that time, a complete transfer of all the employees of Climatrol was made to an independent company, Clover Distributing. In 1977 Mueller Climatrol merged with Fedders.

Bishop supplied Clover Distributing with a purchase order and performance specifications for the Crest job. Some time before the order was accepted by Clover, Don Ennis, a sales representative, called Climatrol's sales manager about the suitability of Climatrol's coils for the job. The coils were rated for a 15-pound steam capacity while Crest's specifications required 30 pounds steam capacity. Ennis was assured the coils would be adequate. The same assurance was later given to Vincent Stanec, vice-president and general manager of Clover. After receiving the assurances, the coils were ordered from Climatrol and shipped directly to the Crest plant.

Bishop's third-party complaint alleged that the coils as manufactured by Climatrol breached an express warranty and the implied warranties of merchantability and fitness for a particular purpose. Breach of warranty is the proper theory for recovery of economic loss. (*Moorman Manufacturing Co. v. National Tank Co.* (1982), 91 Ill. 2d 69, 435 N.E.2d 443.) It prayed for statutory damages or in the alternative for indemnification. A directed verdict was allowed on all three counts.

The standard to be applied by this court in review of a directed

verdict is well established. We must find that all of the evidence, when viewed in the light most favorable to Bishop, so overwhelmingly favors Fedders-Climatrol that no contrary verdict could stand. *Pedrick v. Peoria & Eastern R. R. Co.* (1967), 37 Ill. 2d 494, 510, 229 N.E.2d 504, 513-14.

Five grounds were given by Fedders-Climatrol in support of its motions. We have not been advised by the trial court of the basis of its decision to allow the motions. As a result we are compelled to review each of the grounds given.

We turn first to the argument that Bishop failed to prove any violation of the statutory warranties.

■ The implied warranty of merchantability arises in a contract for the sale of goods if the seller is a merchant with respect to goods of that kind. It requires that the goods be fit for the ordinary purposes for which such goods are used. (Ill. Rev. Stat. 1981, ch. 26, par. 2—314(1),(2)(c).) There is no question raised that the warranty applies to Climatrol. We find sufficient evidence that the coils were not fit for their ordinary purpose. Testimony revealed that the coils were too thin, that one-half inch tubing is not used in a steam heating system. Expert testimony established that it was standard industry practice to pre-pitch coils, yet the coils were not pitched or were pitched in the wrong direction. The expert stated that without the pitch, water won't drain from the coil, thus causing water hammer. This in turn causes the coils to split, eventually causing the leaks. It was noted that some of the tube sheets had pierced holes rather than extruded holes causing the metal to rub against the copper. The rubbing produced weak points where leaks would occur. There was evidence that double inlets on a standard steam coil won't work adequately, and the expert expressed his opinion that the standard steam coil was the wrong type of coil for the job.

■ The implied warranty of fitness for a particular purpose is also applicable to Climatrol. Its existence requires that the seller at the time of contracting has reason to know any particular purpose for which the goods are required. (Ill. Rev. Stat. 1981, ch. 26, par. 2—315.) Evidence of the particular purpose was supplied to Climatrol in the performance specifications. For example, the coils on unit one had to have a capacity to heat 9,500 cubic feet a minute of air from 50° Fahrenheit to 101° Fahrenheit. The coils were to be one row steam heating coils to operate at 30 pounds of steam pressure. We must also find evidence that the buyer relied on the seller's skill or judgment. (Ill. Rev. Stat. 1981, ch. 26, par. 2—315.) There was testimony that Bishop did not participate in selecting the type of coil. The standard

practice was for Climatrol engineers to recommend a specific heating coil to meet the specifications submitted. We have already noted the evidence of breach. The coil tubing was too thin and the double inlet should not have been used on a standard steam coil. Most persuasive is the expert testimony that the standard steam coil was not the right coil for Crest's needs.

■ Illinois law also provides for express warranties. (Ill. Rev. Stat. 1981, ch. 26, par. 2—313.) The parties disagree whether there was an express warranty. Bishop claims that Climatrol's catalog stating that the coils would be "staggered pattern coils of ⅝ in. O.D. seamless copper tubing" created an express warranty. Climatrol argues that this claim and the proof thereof are at variance with Bishop's third-party complaint. The complaint alleged express warranties were created by representations of salesmen. While Climatrol's assertion is correct, it has waived any objection to the variance on this appeal because the objection was not made at trial. (*Thilman & Co. v. Esposito* (1980), 87 Ill. App. 3d 289, 296, 408 N.E.2d 1014, 1020.) Climatrol also argues that the catalog information was not an express warranty for the coils delivered but was just general information prepared for the purpose of ordering materials. It is clear that documents and brochures may constitute express warranties. (Ill. Ann. Stat., ch. 26, par. 2—313, Uniform Commercial Code Comment 5, at 220 (Smith-Hurd 1963).) Such affirmations made during a bargain become a basis of the bargain unless clear affirmative proof shows otherwise. (Ill. Ann. Stat., ch. 26, par. 2—313, Uniform Commercial Code Comment 3, at 219 (Smith-Hurd 1963).) It is without question that the catalog information existed during the bargaining between Bishop and Climatrol. We also find evidence that this information was directed to this particular sale. The catalog was marked in such a fashion as to suggest that it was tailored expressly for the Crest job. The first page lists Crest, Bishop, Clover and Climatrol as the relevant parties. The statement regarding the coils is unmarked while those statements not pertaining to the Crest job are crossed through. Finally, there was uncontradicted testimony that the coils were one-half inch coils thus constituting a breach of warranty.

In light of our decision that there was sufficient evidence of breach, we find it unnecessary to address Bishop's argument that the court should have allowed its expert to express an opinion on the merchantability and fitness of the coils. Similarly, we do not address any issues concerning counsel's offer of proof.

A second ground for the directed verdict was that Bishop failed to prove it suffered damages. Bishop prayed for damages based on

breach of warranty (Ill. Rev. Stat. 1981, ch. 26, par. 2—714), and for consequential and incidental damages (Ill. Rev. Stat. 1981, ch. 26, par. 2—715). In the alternative, it asked for indemnification.

■ As to the claim for indemnification, the Supreme Court of Illinois has recently held that one cannot sue in strict liability in tort nor in negligence for the recovery of economic losses. The appropriate relief is to be found in the comprehensive scheme of the Uniform Commercial Code. (*Moorman Manufacturing Co. v. National Tank Co.* (1982), 91 Ill. 2d 69, 81, 86, 435 N.E.2d 443, 448, 450.) Thus, because Bishop can have no claim for its economic losses in tort, the claim for indemnification based upon a tort, or fault-finding, theory of recovery is improper. The liability of the indemnitee is shifted in whole to the indemnitor under a fault-finding process. In actions for breach of warranty under the Uniform Commercial Code, fault is only relevant to the issue of causation in determining if, in fact, a warranty was breached. Instead, Bishop must rely on the Uniform Commercial Code (Ill. Rev. Stat. 1981, ch. 26, par. 1—101 *et seq.*). The Code explicitly recognizes that the losses between parties in the distributive chain may be shifted. Section 2—607(5)(a) provides the procedural mechanism for cases "[w]here the buyer [Bishop] is sued for breach of a warranty or other obligation [contract] for which his seller [Fedders] is answerable over." (Ill. Rev. Stat. 1981, ch. 26, par. 2—607(5)(a).) Therefore, the suit for breach of warranty against Fedders is the only indemnification claim available to Bishop where the claim is not based on express contractual indemnity.

■ However, there is sufficient evidence of statutory damages. Under the Uniform Commercial Code, if Bishop has shown evidence of a breach of warranty by Fedders and that it has suffered damages to another as a result of that breach, it has made a submissable case. We have already concluded that there is sufficient evidence of a breach by Fedders which could have caused Crest's damages.

■ The formula for measuring warranty damages "is the difference at the time and place of acceptance between the value of the goods accepted and the value they would have had if they had been as warranted." (Ill. Rev. Stat. 1981, ch. 26, par. 2—714(2).) A useful objective measurement of that difference is the cost of repair or replacement. (*Lutgert v. Schaeflein* (1943), 318 Ill. App. 83, 93, 47 N.E.2d 359, 363-64 (replacement cost of defective bricks proper method of measuring damages); *Cox Motor Car Co. v. Castle* (Ky. 1966), 402 S.W.2d 429, 431 (measure of damages is cost of replacing truck with one not defective).) There was evidence that the cost of replacement coils was $8,227. Although Burdick replaced the standard steam coils

with the more expensive steam distributing coil, Burdick testified that the difference would amount to no more than 10%. We need not determine if the trial court's refusal to admit Bishop's records of the cost of repairs made was proper, as on retrial, Bishop will be allowed to offer proof of both its direct and its consequential damages under sections 2—714 and 2—715 of the Code. Ill. Rev. Stat. 1981, ch. 26, pars. 2—714, 2—715.

The remaining three grounds raised by Fedders-Climatrol were privity, freedom from fault and notice.

■ Privity requires that the party suing has some contractual relationship with the one sued. Although the supreme court has done away with the requirement in cases involving personal injury in tort (*Suvada v. White Motor Co.* (1965), 32 Ill. 2d 612, 617, 210 N.E.2d 182, 185), it has not expressly done so in cases involving purely economic loss. In this case, Bishop purchased the coils from Clover, a company independent of Climatrol, and is therefore not in privity with Climatrol. In spite of this general rule, we believe the exception stated by the first district is applicable here. The court held that privity is not required when the remote manufacturer knows "the identity, purpose and requirements of the dealer's customer and manufactured or delivered the goods specifically to meet those requirements." (*Frank's Maintenance & Engineering, Inc. v. C. A. Roberts Co.* (1980), 86 Ill. App. 3d 980, 993, 408 N.E.2d 403, 412.) Bishop's specifications were sent to Climatrol. In fact, Climatrol selected the proper coil based on information supplied by Bishop. Climatrol knew the coils must be able to handle 30 pounds of pressure. The coils were custom made for the job and were delivered directly to the jobsite. Fedders-Climatrol argues that *Frank's Maintenance* is not authority here because the court relied on a case, *Rhodes Pharmacal Co. v. Continental Can Co.* (1966), 72 Ill. App. 2d 362, 219 N.E.2d 726, that abrogated the privity requirement on a third-party beneficiary theory. However, *Rhodes* made it clear that when the party pleaded that it relied on the manufacturer's expertise to select the product, that was sufficient to make the party a beneficiary of the warranties. 72 Ill. App. 2d 362, 372-73, 219 N.E.2d 726, 732.

Fedders-Climatrol also argues Bishop must prove it is free from fault. We have not been directed to any Illinois law that requires one to prove freedom from fault before recovery can be had for economic loss. White and Summers in their hornbook on the Uniform Commercial Code point out that plaintiff's behavior is really a part of a larger question: whether there is proximate causation between defendant's act and plaintiff's loss. Thus, they view plaintiff's behavior as a factor

that may destroy the causal connection between the parties. (J. White & R. Summers, Uniform Commercial Code 411 (2d ed. 1980).) Plaintiff must prove proximate causation in warranty cases. (Ill. Ann. Stat., ch. 26, par. 2—314, Uniform Commercial Code Comment 13, at 234 (Smith-Hurd 1963).) Because there was evidence that the heating system as designed by Bishop would have worked adequately if the coils would have been as warranted, the question is one for the jury.

■■ The final ground supporting the motion for directed verdict is that Bishop failed to notify Climatrol of the breach within a reasonable time after Bishop discovered the breach. Notice is a prerequisite to recovery. (Ill. Rev. Stat. 1981, ch. 26, par. 2—607(3)(a).) The comments to the section indicate that notification need merely be sufficient to let the seller know that the transaction is still troublesome. There is no need to state all objections the buyer has or for the buyer to say he is holding the seller liable and threaten litigation. (Ill. Ann. Stat., ch. 26, par. 2—607, Uniform Commercial Code Comment, at 454 (Smith-Hurd 1963).) Testimony indicates that Warren Kirk, an employee of Climatrol, visited the Crest plant with Amacher "to get to the bottom of why these coils were leaking." The two looked over the system together. We hold that the failure of the system to operate properly in Kirk's presence was notice to Climatrol. *Overland Bond & Investment Corp. v. Howard* (1972), 9 Ill. App. 3d 348, 292 N.E.2d 168; *Boeing Airplane Co. v. O'Malley* (8th Cir. 1964), 329 F.2d 585.

Because we find evidence of notice, it is unnecessary to decide if Bishop should have been allowed to reopen its case to introduce letters of notice, nor is it necessary to address the question whether employees of Clover were agents of Climatrol.

For the foregoing reasons, we affirm the circuit court of Shelby County's judgment in favor of Crest and reverse the court's judgment on a directed verdict in favor of Fedders-Climatrol and remand the cause for a new trial on Bishop's third-party complaint.

Affirmed in part; reversed in part; remanded with directions.

JONES and WELCH, JJ., concur.