RICHARD MALAWY, Plaintiff-Appellee, v. RICHARDS MANUFACTURING COMPANY, Defendant and Cross-Defendant–Appellant (St. Elizabeth's Hospital of the Hospital Sisters of the Third Order of St. Francis, Defendant and Cross-Plaintiff–Appellant).

Fifth District—No. 5—84—0416

Opinion filed December 9, 1986.

Al J. Pranaitis and Robert B. Maucker, both of Hoagland, Maucker, Bernard & Almeter, of Alton, for appellant Richards Manufacturing Company.

Michael J. Nester, of Donovan, Hatch & Constance, P.C., of Belleville, for appellant St. Elizabeth's Hospital of the Hospital Sisters of the Third Order of St. Francis.

Stephen M. Tillery and Roger C. Denton, both of Kassly, Bone, Becker, Dix & Tillery, P.C., of Belleville, for appellee.

JUSTICE KASSERMAN delivered the opinion of the court:

Defendant/cross-defendant, Richards Manufacturing Company, appeals from a judgment of the circuit court of St. Clair County which (1) found it and defendant/cross-plaintiff, St. Elizabeth's Hospital, liable for breach of implied warranties of merchantability and fitness for a particular purpose, and (2) entered summary judgment in favor of defendant/cross-plaintiff, St. Elizabeth's Hospital, on the issue of implied indemnity. Defendant/cross-plaintiff, St. Elizabeth's Hospital, ap-

peals from the judgment finding it liable to plaintiff, Richard Malawy, for breach of implied warranties of merchantability and fitness for a particular purpose.

The facts are as follows. On July 4, 1976, the plaintiff, a 32-year-old autobody mechanic, suffered fractures to his right hip through the base of the neck of the femur and to the shaft of the right femur. The femur-shaft fracture was unstable because it was compound and comminuted. Due to the severity of plaintiff's injuries, he was transferred from a hospital in Breese to St. Elizabeth's Hospital in Belleville.

Dr. Killian Fritsch, an orthopedic surgeon, became plaintiff's treating physician at St. Elizabeth's Hospital. Prior to treating plaintiff, Dr. Fritsch examined X rays of plaintiff's right leg. After doing so, Dr. Fritsch was of the opinion that the most critical problem facing plaintiff was that the hip fracture would develop into a nonunion.

On July 9, 1976, Dr. Fritsch performed surgery on plaintiff's right leg, using the open reduction technique to join both the hip and the femur-shaft fracture. Dr. Fritsch installed bone plates on each fracture. A Richards-Hirschorn heavy-duty compression plate was installed on the femur-shaft fracture. The bone plates used in surgery were supplied by St. Elizabeth's Hospital, and plaintiff's hospital bill included the cost of these bone plates.

Plaintiff developed a low-grade infection while in the hospital. Although he was discharged from the hospital on July 25, 1976, he was readmitted three days later due to this infection. He was discharged again on August 20, 1976.

Plaintiff was walking on crutches and taking antibiotics when Dr. Fritsch saw him on September 20 and November 1, 1976. The X rays taken on November 1 showed that the hip fracture had almost completely healed and that the femur-shaft fracture was healing. Dr. Fritsch therefore permitted plaintiff to begin walking on one crutch. Bearing weight on a fracture facilitates healing by pressing the bone ends together. When X rays taken on December 13, 1976, showed that the femur-shaft fracture had apparently healed, Dr. Fritsch instructed plaintiff to begin using a cane. The prescription for antibiotics was also discontinued at this time.

On or about January 24, 1977, plaintiff informed Dr. Fritsch that he was experiencing pain in the joints of his hip, knee, and ankle. On January 25, 1977, Dr. Fritsch took X rays and discovered that the Richards plate was bent to a 10-degree angle. Plaintiff was instructed to resume using two crutches.

On February 19, 1977, plaintiff was once again admitted to the hospital due to pain in his right leg. Upon discovering that the

Richards plate had broken, surgery was performed on the right leg to remove the plate and to reunite the fracture. The fracture was reunited by driving a Zickle nail across the fracture site, with a bone graft from the condyles of the femur being placed between the bone ends. Dr. Fritsch also removed fibrous union from the fracture site. Fibrous union occurs prior to bony union. Although there was bone formation at the fracture site when surgery was performed, complete bony union had not taken place. The pieces of the Richards plate were taken into custody by St. Elizabeth's Hospital for analysis.

X rays taken on April 4, 1977, showed "a lot of new bone formation." Since the fracture line was still visible in the May 2, 1977, X rays, Dr. Fritsch told plaintiff to begin bearing weight on the right leg in an attempt to get the bones to grow together. X rays taken on August 13 and September 17, 1977, showed progressively stronger bony union. On September 17, plaintiff was instructed to begin using a cane. Although the fracture appeared to be solid on later X rays, plaintiff continued experiencing pain related to the fracture. When Dr. Fritsch ceased treating plaintiff in December 1978, plaintiff had yet to achieve complete bony union of the femur-shaft fracture. The femur-shaft fracture did eventually heal after four surgeries.

Plaintiff commenced the instant action against both defendants on June 3, 1980. His complaint alleged that the failure of the Richards plate that was installed on his femur-shaft fracture caused him undue suffering. After subsequent amendments, plaintiff set forth the following theories of liability against both defendants: (1) strict liability in tort for allowing an unreasonably dangerous bone plate to be installed on plaintiff's right femur, and (2) breach of the implied warranty of merchantability for allowing a bone plate which was unfit for ordinary purposes to be attached to plaintiff's right femur, and (3) breach of the implied warranty of fitness for a particular purpose for allowing a bone plate which was unfit for the particular purpose of uniting a compound, comminuted femur-shaft fracture to be attached to plaintiff's right femur.

The following expert testimony was admitted at trial. Although Dr. Fritsch refused to express an opinion as to the integrity of the instant bone plate, he believed that the primary reason for the nonunion of plaintiff's femur-shaft fracture prior to the plate's breaking was the infection plaintiff had while in the hospital. Dr. Fritsch explained that even a low-grade infection, such as the one plaintiff had during convalescence, can contribute to nonunion because it changes the chemistry at the situs of the fracture.

Dr. William Simmons, who was treating plaintiff at the time of

trial, testified that he had reviewed plaintiff's medical records and X rays concerning the femur-shaft fracture prior to testifying. In Dr. Simmons' opinion, union of plaintiff's femur-shaft fracture was progressing normally until the January 25, 1977, X rays, which showed the 10-degree bend in the bone plate. In response to a hypothetical question which assumed (1) that it takes an orthopedist one year from the date of a compound, comminuted femur-shaft fracture to determine whether or not union is going to take place, (2) that union of plaintiff's femur-shaft fracture appeared to be progressing normally prior to the bone-plate break, and (3) that plaintiff began partial weight bearing upon the fracture on November 1, 1976, Dr. Simmons stated that he was extremely suspicious of the instant bone plate's integrity. Dr. Simmons further testified that it was not possible to install the instant bone plate without it coming into contact with surgical instruments.

Dr. Simmons admitted that he was not an expert on the properties of metals and also admitted that there was no guarantee that the femur-shaft fracture would have achieved union if the bone plate had not broken. However, Dr. Simmons testified that he believed that the four surgeries performed after the bone plate broke would not have been necessary if the plate had not broken and that plaintiff's current physical impairment would not have been as severe.

Dr. John Patrick Crotty, a radiologist experienced in taking and interpreting X rays of bones and metallic objects, testified that the femur-shaft fracture was apparently healing normally up until the time the bone plate broke. In an oblique X ray taken on July 28, 1976, Dr. Crotty noted a comma-shaped dot darker than the areas of the screw holes. Although he did not see this dot in any of the other X rays taken prior to the breaking of the bone plate, Dr. Crotty interpreted this dot as a flaw in the bone plate.

Prior to trial, Dr. Crotty examined the instant bone plate and X-rayed it with a cobalt teletherapy unit and a standard X ray unit. Although this was the first time he had done so to detect a flaw in a bone plate, he had on previous occasions interpreted X rays of gun barrels, metal boiler rods, and live ammunition for this purpose. After doing so, he noticed a small zone of increased density in the lower margin of the bone-plate break. Dr. Crotty believed this lower margin of the bone plate had been compressed into the stainless steel surrounding it when it was manufactured. Dr. Crotty stated that this should not be present in a bone plate. In Dr. Crotty's opinion, these X-ray findings, combined with the fact that the bone plate broke where the comma-shaped dot appeared in the July 28, 1976, X rays,

established a metallurgical flaw in the bone plate. As further support for this conclusion, Dr. Crotty was of the opinion that if the bone-plate break was caused by the femur-shaft fracture rather than a defective bone plate, the bone-plate break would have been symmetrical and smooth rather than asymmetrical and rough. Dr. Crotty also believed that if the bone plate had broken due to stress from the femur-shaft fracture, it would not have broken above the fracture line as did the instant bone plate. In Dr. Crotty's opinion, the bone plate would never have broken above the fracture line absent a defect in the integrity of the plate. Based upon his findings and the representations of Richards concerning the instant bone plate, Dr. Crotty believed that the instant bone plate was unfit for its intended purpose.

Dr. Imogene Baswell, a biomedical metallurgist for defendant Richards, testified that she examined the instant bone plate under a microscope and found fatigue striations. Fatigue striations result when a load or stress, such as that resulting from the femur-shaft fracture, is applied, removed, and reapplied. This phenomenon is referred to as cyclic loading. Apparently, in her opinion, the bone-plate break originated in a screw hole located above the femur-shaft fracture line. Although Dr. Baswell found no inclusions (*i.e.*, foreign material) in the plate which could result in a weakening of the metal, she did observe a scratch on the plate which intersected the bone-plate break. She believed that this scratch, in combination with the fatigue striations, could have contributed to the bone-plate break. Dr. Baswell disagreed with Dr. Crotty's earlier statement that one of the possible reasons for the alleged defect being present in the July 28, 1976, X rays but not in subsequent X rays prior to the bone-plate break was a loss of volume in the metal after the July 28 X rays. Dr. Baswell stated that her opinion was based on the fact that the contact between the plate and the screw at the break was not sufficient to cause such loss of volume.

Dr. David Felbeck, a mechanical engineer whose professional specialty is the analysis of metallurgical failures, testified that the bone plate broke due to fatigue caused by cyclic loading. He explained that cyclic loading caused gradual propagation of a crack in the bone plate which apparently originated from two locations around a screw hole located immediately above the femur-shaft fracture line. During his examination of the plate, Dr. Felbeck noted three visible scratches which preexisted the bone-plate break. He believed that these scratches would have a profound effect upon the bone plate's fatigue strength. According to Dr. Felbeck's calculations, the comma-shaped dot which Dr. Crotty saw in the July 28, 1976, X rays was actually

the edge of the screw hole where the fatigue striations originated. Dr. Felbeck believed that this dot was nothing more than a drill hole. Dr. Felbeck found no voids or inclusions in the metal. He explained that X rays of the bone plate were unnecessary because there would be no voids in a forged-metal bone plate. In Dr. Felbeck's opinion, the bone plate was not defective and was entirely fit for its intended purpose.

Dr. William G. Allen, an orthopedic surgeon who had installed about 2,000 bone plates in his career, testified that the purpose of a bone plate is to hold the bones together while they heal. He stated that a bone plate is not meant to take the place of bone in terms of weight bearing. During his years of practice he had seen several broken bone plates. It was his opinion that the nonunion of the femur-shaft fracture and plaintiff's weight bearing on his right leg placed the bone plate under stress sufficient to cause fatigue and breakage. In Dr. Allen's opinion, the instant bone plate was fit for its intended purpose and performed in the manner that was expected and intended.

Dr. Sherwyn Wayne, an orthopedic surgeon who examined plaintiff at defendant Richards' request, testified that plaintiff's femur-shaft fracture had healed with good result and that he believed plaintiff could perform any type of gainful employment which he could have performed prior to the injury. Dr. Wayne believed that the surgeries plaintiff underwent after the bone-plate break would have been necessary without the bone-plate break.

Plaintiff testified that due to his injuries he could no longer perform the automobile body work he previously performed because the conditions of his knees will not allow him to squat or kneel. Plaintiff also testified that he scrupulously followed Dr. Fritch's instructions as to weight bearing on his right leg prior to the bone-plate break. Plaintiff further claimed that he did not know he had a right to sue defendant Richards for the malfunctioning of the bone plate until September 1978.

At trial special interrogatory number one was submitted to the jury. It solicited the jury's answer to the following interrogatory:

"Do you, the Jury, find that the bone plate in question was unreasonably dangerous at the time it left the control of the Defendants and that the condition was a proximate cause of the Plaintiff's injuries?"

In response to this interrogatory, the jury found that the instant bone plate was not unreasonably dangerous when it left the manufacturer. In addition, the jury returned a verdict in favor of plaintiff and against defendants, awarding damages in the amount of $606,910.06.

Pursuant to the jury's response to special interrogatory number one, the trial court dismissed the strict liability counts against each defendant but allowed the award to stand on the warranty theories.

On appeal, defendant Richards contends that: (1) the jury's finding that the bone plate was not unreasonably dangerous precludes a finding of liability based upon either warranty theory; (2) the trial court should have dismissed the warranty counts because plaintiff failed to give defendant Richards sufficient notice of his intention to file an action based upon warranty; (3) the trial court erred in excluding certain evidence and in admitting other evidence; (4) the trial court erred in giving certain jury instructions and in refusing others regarding the warranty theories; (5) the portion of the jury verdict pertaining to future medical expenses is excessive; and (6) the trial court should have allowed defendant Richards' motion for change of venue after trial. In its appeal, St. Elizabeth's Hospital urges as grounds for reversal substantially the same issues as are relied upon in issues (1) and (4) raised by defendant Richards regarding liability to plaintiff. On cross-appeal, defendant Richards contends that the trial court erred in granting the motion of defendant St. Elizabeth's Hospital for summary judgment on the issue of implied indemnity.

Defendants Richards and St. Elizabeth's Hospital contend that the jury's finding that the bone plate was not "unreasonably dangerous" precludes a finding of warranty liability. Specifically, it is urged that to sustain liability on a theory of implied warranty, a defect in a product must exist and that such a defect, according to prevailing Illinois implied-warranty law, means that the product is "unreasonably dangerous."

It is well settled in Illinois that in order to recover on the basis of strict liability in tort, a plaintiff must establish (1) that the injury or damage resulted from a condition of the product, (2) that the condition was an unreasonably dangerous one, and (3) that the condition existed at the time it left the manufacturer's control. (*Suvada v. White Motor Co.* (1965), 32 Ill. 2d 612, 623, 210 N.E.2d 182, 188.) As a basis of recovery for the breach of an implied warranty of merchantability, a plaintiff must establish (1) a sale of goods, (2) that the seller of the goods is a merchant with respect to those goods, and (3) that the goods were not of merchantable quality (*i.e.*, unfit for the ordinary purposes for which such goods are used). (Ill. Rev. Stat. 1977, ch. 26, par. 2—314; *Great Container Corp. v. R. H. Bishop Co.* (1982), 111 Ill. App. 3d 1068, 1073, 445 N.E.2d 19, 23; see also Polelle and Ottley, Illinois Tort Law at 550-52 (1985).) To prove breach of an implied warranty of fitness for a particular purpose, a plaintiff must

show (1) a sale of goods, (2) that the seller had reason to know of any particular purpose for which the goods are required, (3) that plaintiff, as buyer of the goods, was relying upon seller's skill or judgment to select suitable goods, and (4) that the goods were not fit for the particular purpose for which they were used. Ill. Rev. Stat. 1977, ch. 26, par. 2—315; *Crest Container Corp. v. R. H. Bishop Co.* (1982), 111 Ill. App. 3d 1068, 1073-74, 445 N.E.2d 19, 23; see also Polelle and Ottley, Illinois Tort Law at 550-52 (1985).

■ Although it has been recently stated that strict liability in tort " 'is essentially the liability of implied warranty divested of the contract doctrines of privity, disclaimer, and notice,' " (*Nave v. Rainbo Tire Service, Inc.* (1984), 123 Ill. App. 3d 585, 592-93, 462 N.E.2d 620, 625, quoting *Dunham v. Vaughan & Bushnell Manufacturing Co.* (1967), 86 Ill. App. 2d 315, 333), the nature of the improper conduct on the part of the manufacturer which must be shown before liability is imposed is not the same under both theories. The theory of strict liability in tort imposes liability upon the manufacturer of goods only if there was a "defect" when they left the manufacturer's control. On the other hand, a manufacturer is liable for the breach of an implied warranty if the goods are either unmerchantable or are unfit for the particular purpose for which they are intended to be used when they leave the manufacturer's control. They need not be shown to contain a "defect."

The relationship between a "defect" in a product and liability for breach of an implied warranty as to such product has been described as follows:

> "It is unfortunate that the warranty law has been so influenced by the tort law. With respect to negligence and strict tort, it is logical to require that there be a defect in the goods. In the case of warranty, it should be sufficient to impose liability that there has been a breach of warranty. In many cases, the breach of warranty consists of the presence of a defect that prevents the goods from being used. In other cases, the breach consists merely of failing to conform to the contract's standard. For example, when the seller delivers a red table instead of the green table required by the contract there is clearly a breach of warranty. Yet the red table was not defective in any intelligent sense of the word merely because it did not conform to the contract. It is also unfortunate that the personal injury claim has apparently dominated the litigation scene or at least the judicial thought.
> Many of the cases seek to make a quantitative distinction as

to how dangerous a product must be in order to be classified as 'defective.' Yet there is not a warranty in the [Uniform Commercial] Code that could not be broken by a perfectly made product. Conformity to the standard, satisfaction of the minimum criteria of the warranty of merchantability, [and] fitness for the particular purpose of the buyer are the criteria for determining whether warranties have been satisfied. Conversely, there is a breach of warranty by proof that these criteria have not been satisfied. Failure to satisfy the criteria are the significant matters without regard to whether the goods are 'defective' or without a flaw.

The need for defining a defect becomes unnecessary insofar as warranty law is concerned if the matter is approached from the aspect of conformity or nonconformity, rather than in terms of whether there is a defect. The presence of a defect should be regarded as merely evidence of the fact that the goods are in such a condition that some warranty has been broken. If all the circumstances lead to the conclusion that the goods do not conform, there is a breach of warranty. It is unnecessary to determine whether what made them not conform is to be labeled a 'defect.' " (3 Anderson, Uniform Commercial Code, sec. 2—314:56, at 163 (3d ed. 1983).)

Therefore, the pivotal inquiry as to liability for the breach of an implied warranty is whether the product conforms to the standards of merchantability or fitness established by the contractual relationship. Although a "defect" in a product may be evidence of nonconformity, a "defect" in a product is not required to be established to sustain liability for the breach of an implied warranty. While we are aware of cases which hold that a "defect" in a product must be established to sustain a breach of implied warranties of merchantability (*141 South Main, Inc. v. Magic Fingers, Inc.* (1977), 49 Ill. App. 3d 724, 727, 364 N.E.2d 605, 607) and fitness for a particular purpose (*Van Winkle v. Firestone Tire & Rubber Co.* (1969), 117 Ill. App. 2d 324, 328, 253 N.E.2d 588, 590), we are of the opinion that these holdings do not comport with the prevailing theories regarding liability for the breach of an implied warranty envisioned under the Uniform Commercial Code; therefore, we decline to follow them. Consequently, we reject the assertion of defendants Richards and St. Elizabeth's Hospital that the jury's finding that the bone plate in the case at bar was not "unreasonably dangerous" precludes liability on the basis of the breach of an implied warranty.

■ The second issue raised by the appeal of defendant Richards

is that it did not receive notice of plaintiff's warranty claims within a reasonable time after plaintiff discovered or should have discovered the breach, as required by the Uniform Commercial Code. (Ill. Rev. Stat. 1979, ch. 26, par. 2—607(3)(a).) Defendant Richards contends that the trial court erred in finding as a matter of law that it was informed of the instant claim within a reasonable time. Accordingly, defendant Richards asks that we either reverse the trial court's judgment outright and deny recovery, or that we remand this cause for a finding of fact as to whether the notice plaintiff gave defendant Richards was reasonable.

Under section 2—607(3)(a) of the Uniform Commercial Code (Ill. Rev. Stat. 1979, ch. 26, par. 2—607(3)(a)), a buyer of a product is required to give notice of a breach of implied warranty to his immediate seller. (*Goldstein v. G. D. Searle & Co.* (1978), 62 Ill. App. 3d 344, 347, 378 N.E.2d 1083, 1086.) An evaluation of whether the notice requirement has been complied with must be based upon the factual setting of each case and the circumstances of the parties involved. *Wagmeister v. A. H. Robins Co.* (1978), 64 Ill. App. 3d 964, 966, 382 N.E.2d 23, 25.

■ In the instant case, the bone plate was sold to plaintiff by St. Elizabeth's Hospital. It broke in plaintiff's leg on February 18, 1977, and was subsequently removed at St. Elizabeth's Hospital on February 25, 1977. After the bone plate's removal, St. Elizabeth's Hospital took possession of the bone plate and remained in possession until after legal action was filed concerning the plate. On February 14, 1979, pursuant to Dr. Fritsch's indication that the instant bone plate was manufactured by Zimmer Manufacturing Company, plaintiff filed suit against Zimmer and St. Elizabeth's Hospital. On June 3, 1980, plaintiff discovered that the instant bone plate was manufactured by defendant Richards. Plaintiff then amended its suit to include Richards as a party.

When a seller's employee actually observes the failure of a product, this constitutes notice to the seller. (*Crest Container Corp. v. R. H. Bishop Co.* (1982), 111 Ill. App. 3d 1068, 1077, 445 N.E.2d 19, 25-26.) In the instant case, employees of the immediate seller, St. Elizabeth's Hospital, took possession of the bone plate immediately after it broke. Since this constitutes actual notice to the immediate seller that the bone plate which it sold to plaintiff malfunctioned, we find that the seller had notice immediately after the bone plate's removal from plaintiff's leg. Furthermore, defendant Richards was notified of the break of the plate immediately after plaintiff obtained knowledge that it was the manufacturer of the plate; therefore, we

conclude that the trial court did not err in ruling as a matter of law that reasonable notice was given.

■ The third issue raised by defendant Richards is that the trial court made several erroneous evidentiary rulings. These rulings, the evidence they affected, and our analysis of the propriety of these rulings are as follows.

Dr. Sherwyn Wayne, an orthopedic surgeon, examined plaintiff at the behest of defendant Richards. Plaintiff scheduled a discovery deposition of Dr. Wayne for May 23, 1983. Defendant Richards scheduled an evidence deposition of Dr. Wayne for the same date. Immediately prior to the depositions, defendant Richards informed plaintiff of its intent to have Dr. Wayne testify as an expert concerning bone plates. During the discovery deposition, plaintiff interrogated Dr. Wayne concerning his qualifications as a bone-plate expert and his opinion as to the reasons for the instant bone plate's failure. Prior to the start of the evidence deposition, plaintiff objected to the inclusion of any testimony by Dr. Wayne outside of his physical examination of plaintiff because the sudden disclosure of Dr. Wayne as a bone-plate expert would prejudice his cross-examination. Defendant Richards' offer to permit plaintiff to question Dr. Wayne at greater length concerning his expertise on bone plates prior to the evidence deposition was refused by plaintiff.

At the evidence deposition Dr. Wayne testified as follows concerning the bone plate. During his career as an orthopedic surgeon, he had installed approximately 1,000 bone plates, over 100 of which were installed on fractured femurs. In his private practice, Dr. Wayne had seen three or four patients who had nonunions of the femur with plate failure. The plates which had broken in Dr. Wayne's patients were similar to the Richards plate which had broken in plaintiff's leg. Dr. Wayne testified that he believed that the nonunion of plaintiff's femur-shaft fracture created stress to the bone plate, causing it to break. In his opinion, no form of bone plate known to him would have remained on the femur and not broken.

Plaintiff filed a motion *in limine* in which he sought to exclude all of Dr. Wayne's testimony regarding the bone plate. Plaintiff contended that defendant Richards had violated discovery procedures by not disclosing Dr. Wayne's expertise pursuant to (1) a court order entered on September 20, 1982, requiring disclosure of expert witnesses within 45 days, and (2) plaintiff's request for such disclosure filed on October 13, 1982. Furthermore, since the discovery and evidence depositions of Dr. Wayne took place on May 23, 1983, approximately two weeks before trial, the belated disclosure of Dr. Wayne as a bone-

plate expert unduly surprised plaintiff, thereby causing prejudice to his trial preparation. The trial court granted plaintiff's motion, allowing into evidence only those portions of Dr. Wayne's evidence deposition pertaining to his physical examination of the plaintiff.

■ We note at the outset that all of the parties acquiesced in a December 16, 1982, court order extending the time for disclosing expert witnesses. Consequently, the court order entered on September 20, 1982, was of no effect. However, we need not discuss whether not allowing Dr. Wayne to testify as to his expertise on bone plates was prejudicial because such error, even if present, was harmless because Dr. Wayne's testimony would have been cumulative to the testimony of Dr. William Allen. *Hazelwood v. Illinois Central Gulf R.R.* (1983), 114 Ill. App. 3d 703, 708, 450 N.E.2d 1199, 1204.

■ Defendant Richards' second evidentiary contention is that the trial court erred in excluding certain testimony elicited from Dr. Killian Fritsch during an evidence deposition taken at plaintiff's behest on June 2, 1983. The excluded testimony included (1) certain medical conditions suffered by plaintiff (*i.e.*, pneumonia and peptic ulcer) while plaintiff was receiving treatment for his fractures, (2) Dr. Fritsch's statement that he prescribed massive doses of calcium, male hormones, and vitamin B for plaintiff in an effort to "use everything I could to try and enhance healing," and (3) Dr. Fritsch's statement that (a) there was not complete union of the femur-shaft fracture and that this places considerable stress on a bone plate, (b) that he had experienced bone plates breaking before and that anyone who does a lot of surgery has this happen, (c) he knew that fracture of the plate could occur if the fracture did not heal, and (d) if nonunion of the fracture occurs, the bone plate will eventually break. This testimony was excluded by the trial court as irrelevant.

The determination of relevancy is largely within the discretion of the trial court and reversal of its decision is not warranted absent an abuse of that discretion. (*Carlyle v. Jaskiewicz* (1984), 124 Ill. App. 3d 487, 496, 464 N.E.2d 751, 758.) In determining relevancy the court must consider the evidence in light of the factual issues raised by the pleadings, and it is not error to exclude testimony which does not bear on the specific issues under consideration. Since the counts based on strict liability were dismissed in the case at bar, we need only consider the trial court's ruling in light of the implied-warranty counts.

It is undisputed that plaintiff's femur-shaft fracture had not healed prior to the break of the bone plate. Although evidence concerning plaintiff's preexisting medical condition and the treatment Dr. Fritsch provided during healing would be highly relevant if Dr.

Fritsch were defending this action, we see little relevance in setting forth the reasons why the fracture had not healed prior to the bone-plate break in the instant case. Moreover, the court admitted into evidence Dr. Fritsch's opinion that the nonhealing of the femur-shaft fracture was caused by the low-grade infection plaintiff experienced during recovery. We therefore find no abuse of discretion as to the exclusion of this evidence.

■■■ Regarding the propriety of the trial court's excluding Dr. Fritsch's testimony concerning his installation of bone plates on other occasions, it is settled that in order to establish the evidentiary relevancy of a "similar" occurrence, the party seeking to admit the "similar" occurrence must establish a sufficient degree of similarity between the "similar" occurrence and the one in question. (See E. Cleary & M. Graham, Illinois Evidence sec. 401.14, at 139 (4th ed. 1984).) In the instant case the testimony of Dr. Fritsch concerning prior bone-plate breaks would be relevant so long as a sufficient degree of similarity was established between prior bone-plate breaks and the instant bone-plate break.

A proper foundation for the admission of testimony relating to prior bone-plate breaks observed by Dr. Fritsch would consist of (1) a showing that the bone plates which had broken previously were substantially identical to the instant bone plate, and (2) a showing that the bone plates which had broken previously were used in sufficiently similar circumstances to those surrounding the instant bone-plate break so as to allow the jury to connect past experience with the incident sued upon. (See *Walker v. Trico Manufacturing Co.* (7th Cir. 1973), 487 F.2d 595, 599.) From our examination of Dr. Fritsch's evidentiary deposition, it is not apparent whether a proper foundation was laid for this testimony. However, we note that such testimony was cumulative to that admitted through Dr. William Allen. (*Cf. Hazelwood v. Illinois Central Gulf R.R.* (1983), 114 Ill. App. 3d 703, 708, 450 N.E.2d 1197, 1204.) We therefore conclude that failure to admit this evidence was not reversible error.

■■■ The third evidentiary matter upon which review is sought is that the trial court erred in not allowing evidence that the instant bone plate met or exceeded industry standards. We agree that such evidence should have been admitted as to the strict liability counts. (See *Rucker v. Norfolk & Western Ry. Co.* (1979), 77 Ill. 2d 434, 439, 396 N.E.2d 534, 536-37.) However, evidence that a product complied with industry standards is not a defense for an action based upon breach of an implied warranty unless noncompliance with the standard itself constitutes the alleged breach of warranty. (See 3 Anderson,

Uniform Commercial Code sec. 2—314:180, at 268-69 (3d ed. 1983).) Noncompliance with industry standards was not alleged here. Furthermore, since the strict liability counts were dismissed pursuant to the jury's finding that the instant bone plate was not unreasonably dangerous, and since we need only consider plaintiff's suit as it relates to the implied-warranty counts, we reject defendant Richards' assertion that the exclusion of this evidence was reversible error.

The fourth evidentiary contention raised by defendant Richards is that the trial court unduly restricted defendant Richards' impeachment of Dr. John Patrick Crotty. Specifically, it is alleged that Dr. Crotty marked different locations as the alleged defect in the bone plate in two separate depositions. In this regard, an appellant has the burden to present a sufficiently complete record of the proceedings at trial to support a claim of error, and in the absence of such record on appeal, it will be presumed that the order entered by the trial court was in conformity with the law and had a sufficient factual basis. (*Foutch v. O'Bryant* (1984), 99 Ill. 2d 389, 391-92, 459 N.E.2d 958, 959.) Since the depositions in question are not in the record on appeal, we must assume that the trial court's ruling limiting the impeachment of Dr. Crotty was reasonable.

The final evidentiary contention raised by defendant Richards is that Dr. Crotty and Dr. William Simmons were not qualified to render expert opinions as to the integrity of the instant bone plate. It is settled in Illinois that an expert witness is qualified if, because of his skill, training and experience, he is better able to form an accurate opinion as to the issue in question than is the average person in the community. The determination of whether a witness is qualified as an expert rests largely in the discretion of the trial court. (*In re M.B.C.* (1984), 125 Ill. App. 3d 512, 515, 466 N.E.2d 273, 276.) Dr. Crotty, a radiologist, testified that prior to trial he had X-rayed metallic objects for flaws and interpreted these X rays for the armed forces and for private individuals and law-enforcement agencies. Dr. Simmons, an orthopedic surgeon who had installed and treated persons with bone plates, testified that in view of the length of time the bone plate had been attached to plaintiff's femur and the fact that plaintiff was only partially bearing weight during the time prior to the bone-plate break, he was highly suspicious of its integrity. In view of the foundations established for the testimony of both Dr. Crotty and Dr. Simmons, we conclude that the trial court did not abuse its discretion in allowing these witnesses to express expert opinions as to the bone plate's integrity.

We next turn to the fourth issue defendant Richards raises,

which is also raised by St. Elizabeth's Hospital, concerning the propriety of the jury instructions. Specifically, both defendants contend that the jury instructions as to the alleged breach of implied warranties did not accurately state the law because they did not require the jurors to find that the bone plate was defective. As stated previously, the pivotal question as to implied warranty for a product is whether the product conforms to the standards of merchantability or fitness established by the contractual relationship. Although a "defect" in a product is evidence of nonconformity, a "defect" in a product is not necessarily required to be established in order to sustain liability for the breach of an implied warranty. Since we have determined that a "defect" is not necessarily required to be shown to sustain implied-warranty liability, the trial court's ruling on these instructions was proper.

■■ Defendants also challenge the propriety of plaintiff's instruction number 17, a non-Illinois Pattern Jury Instruction instruction, which provided:

> "Under our law, the plaintiff can attempt to prove his case with alternative theories. Therefore, your verdict should be for the plaintiff if you find from your consideration of all the evidence, that the plaintiff has proved each of the propositions of any one Count of his Complaint.

> On the other hand, your verdict should be for the defendants if you find from your consideration of all the evidence that the plaintiff has failed to prove all the propositions of each Count of his Complaint against each defendant."

Defendants specifically contend that the phrase "all the propositions" in the second paragraph of the instruction incorrectly stated the law and resulted in prejudicial error. We agree that this phrase incorrectly states the law and that the phrase properly should state "any of the propositions." We now need to determine whether this incorrect instruction resulted in prejudicial error.

As a general rule, reversal will not be ordered on the basis of faulty jury instructions unless the jury is misled thereby, and the complaining party suffered prejudice. (*Roman v. City of Chicago* (1985), 134 Ill. App. 3d 14, 18, 479 N.E.2d 1064, 1067.) Since the counts based on strict liability were dismissed in the case at bar, we need only consider the error in light of the implied-warranty counts.

Plaintiff's instruction number 16, which we have determined was properly given, provided in pertinent part:

> "As to Count III of plaintiff's Complaint, the plaintiff has the burden of proving each of the following propositions:

First, that when the defendants sold the bone plate, it was not fit for the ordinary purpose such bone plates are used;

Second, that the plaintiff was injured;

Third, that the condition of the bone plate was a proximate cause of the plaintiff's injury.

If you find from your consideration of all the evidence that each of these propositions has been proved, then your verdict should be for the plaintiff as to Count III. But, if on the other hand, you find from your consideration of all the evidence that any of these propositions has not been proved, then your verdict should be for the defendants as to Count III.

As to Count IV of plaintiff's Complaint, the plaintiff has the burden of proving each of the following propositions:

First, that when the defendants sold the bone plate, it was not fit for the particular purpose such bone plate was used;

Second, that the plaintiff was injured;

Third, that the condition of the bone plate was a proximate cause of the plaintiff's injury.

If you find from your consideration of all the evidence that each of these propositions has been proved, then your verdict should be for the plaintiff as to Count IV. But, if on the other hand, you find from your consideration of all the evidence that any of these propositions has not been proved, then your verdict should be for the defendants as to Count IV."

Defendants' special interrogatory number 2 provided:

"Do you, the Jury, find that the bone plate in question was not fit for the ordinary purposes for which such a bone plate is sold and that the condition was a proximate cause of the plaintiff's injuries?"

Defendants' special interrogatory number 3 provided:

"Do you, the Jury, find that the bone plate was not fit for the particular use for which it was used and that the condition was a proximate cause of the plaintiff's injuries?"

Since the parties acknowledged (1) that defendants sold plaintiff the bone plate, (2) that defendants were merchants as to the bone plate affixed to plaintiff's femur-shaft fracture, and (3) that plaintiff was relying upon defendant's skill or judgment to select a suitable bone plate, the only issue open to factual determination was whether plaintiff's injuries were proximately caused by breaches of implied warranties of merchantability and fitness for a particular purpose. Thus, there was little possibility that the jury would be misled as to the propositions which had to be proved to sustain verdicts for

breaches of implied warranty. Moreover, it is apparent from the jury's affirmative answers to defendants' special interrogatories numbers 2 and 3 and its specific findings of liability as to count III (implied warranty of merchantability) and count IV (implied warranty of fitness for a particular purpose) that the jury did not misunderstand the propositions plaintiff was required to prove to establish defendant's liability under implied warranty theory. Thus, the error was not prejudicial.

■■■ The fifth issue raised by defendant Richards is that the damages awarded plaintiff for future medical expenses were excessive. The jury's damage verdict was as follows:

| | |
|---|---|
| Disability— | $ 90,000.00 |
| Past medical expenses— | 16,910.06 |
| Future medical expenses— | 100,000.00 |
| Past loss of earnings— | 50,000.00 |
| Future loss of earnings— | 175,000.00 |
| Past pain and suffering— | 50,000.00 |
| Future pain and suffering— | 125,000.00 |
| TOTAL: | $606,910.06 |

In this regard, defendant Richards contends that the future-medical-expense award is indicative of passion and prejudice on the jury's part.

As defendant Richards correctly states, a damage verdict cannot stand when it is indicative of passion or prejudice on the jury's part. (*Jumer v. Henneberry* (1978), 61 Ill. App. 3d 422, 427, 377 N.E.2d 1328, 1332.) In the instant case Dr. Simmons, plaintiff's orthopedist, testified that plaintiff had 2 plates and 17 screws attached to his femur at the time of trial. Dr. Simmons stated that each one of the screw holes represented a potential area of refracture. Dr. Crotty, a radiologist, testified that his review of the X rays revealed that plaintiff was experiencing bone atrophy and instability to his right knee where the Zickle nail was inserted after the bone plate broke. Although plaintiff had incurred undisputed medical expenses of $16,910.06 over a six-year period from the femur-shaft fracture, his life expectancy was 34½ years at the time of trial. Given the expert testimony as to the possible future consequences of plaintiff's injury, we conclude that the jury's verdict as to future medical expenses is not indicative of passion and prejudice.

■■■ The sixth issue raised by defendant Richards is that its motion for change of venue should be granted even though it was made after the completion of trial. Specifically, it is alleged that a partner in

the law firm representing plaintiff was treasurer of the presiding judge's election campaign in 1982. Our supreme court has declared that "there is always a right to a change of venue, even after a substantial ruling [by the trial court], if actual prejudice can be demonstrated, provided the motion is made at the earliest practical moment after prejudice is discovered." (*In re Marriage of Kozloff* (1984), 101 Ill. 2d 526, 532, 463 N.E.2d 719, 722.) After reviewing the issues, we fail to find a demonstration of actual prejudice on the part of the presiding judge which would warrant a change of venue.

Since we have determined that defendants Richards and St. Elizabeth's Hospital are liable to plaintiff, we must now decide the issue raised by Richards in its cross-appeal against St. Elizabeth's. Defendant Richards contends in its cross-appeal that the trial court erred in granting the motion of St. Elizabeth's Hospital for summary judgment on the issue of implied indemnity. Specifically, defendant Richards alleges that: (1) there was evidence that scratches were placed upon the instant bone plate through the negligence of St. Elizabeth's which could have caused it to break, thereby creating a genuine issue as to a material fact, and (2) the failure of St. Elizabeth's to give defendant Richards notice of the bone-plate break prior to the filing of the amended complaint against defendant Richards precluded St. Elizabeth's from seeking indemnification. In reply, St. Elizabeth's Hospital urges that: (1) no issue of material fact exists because there is no evidence suggesting that employees, agents, or servants of the hospital mishandled the bone plate, and (2) since the hospital immediately notified Richards when it discovered that Richards had manufactured the bone plate and since defendant Richards had approximately three years to investigate and defend plaintiff's claim and has never claimed an inability to defend the claim due to lack of notice, the purpose of the notice requirement of the Uniform Commercial Code was satisfied.

At the outset we note that since the instant injury occurred prior to March 1, 1978, the doctrine of contribution among joint tortfeasors has no effect upon St. Elizabeth's claim for implied indemnity. (*Skinner v. Reed-Prentice Division Package Machinery Co.* (1977), 70 Ill. 2d 1, 16-17, 374 N.E.2d 437, 444; Ill. Rev. Stat. 1983, ch. 70, par. 301 *et seq.*) Consequently, we need not consider case law developing since the decision in *Skinner* and the passage of the act relating to contribution among joint tortfeasors, both of which limit the application of implied indemnity. *Allison v. Shell Oil Co.* (1986), 113 Ill. 2d 26, 495 N.E.2d 496.

Furthermore, we need not address the issue of notice as it applied

to the court's granting of St. Elizabeth's Hospital's motion for summary judgment because defendant Richards waived such issue by failing to raise it before the hearing on St. Elizabeth's motion for summary judgment. *Cf. Berry v. G. D. Searle Co.* (1974), 56 Ill. 2d 548, 556, 309 N.E.2d 550, 555.

We now turn to the question of whether a genuine issue of material fact existed as to St. Elizabeth's alleged responsibility for mishandling of the bone plate. Defendant Richards relies upon the following deposition testimony of metallurgist Dr. David Felbeck in support of its contention that a genuine issue of material fact existed as to the alleged mishandling of the bone plate by St. Elizabeth's Hospital:

"Q. Do you have any opinion as to what would cause these scratches to exist on the plate?

A. Some kind of gross mishandling of the part, yes.

Q. Do you have an opinion as to who would have conducted this gross mishandling of the part?

A. I don't know who, someone in the hospital who handled the part. Richards takes tremendous pains to assure the integrity of the part. And there's no way that I believe this part could have left Richards Manufacturing in that condition.

Q. Do I [*sic*] have any evidence or proof that that part did not leave Richards Manufacturing with those scratches on it?

A. I have observed Richards' quality control procedures and in my opinion that is virtually impossible. I do not have specific evidence of this part, since I was not there it did not leave in the right condition. But I do not believe it.

Q. How many times have you personally observed the quality control program at Richards?

A. Once.

Q. I only have one question, Doctor. Do you have an opinion as to whether or not the scratched [*sic*] that are present in the area of the third screw hole from the proximal end of the plate would be consistent with scratches made by a screwdriver?

A. Yes, it certainly could be."

A motion for summary judgment raises the primary issue of whether the nonmovant has presented any evidence giving rise to a genuine issue of material fact. Where the evidence either raises no issue of material fact or where crucial issues of material fact are refuted by affirmative matter, summary judgment may properly be granted. *Ralston v. Casanova* (1984), 129 Ill. App. 3d 1050, 1056, 473 N.E.2d 444, 448-49.

In the case at bar, defendant Richards urges that a genuine issue exists as to whether St. Elizabeth's Hospital was guilty of misuse of the bone plate and therefore is not entitled to be indemnified. In this regard, defendant Richards relies on the deposition of Dr. Felbeck set out above in which he testified that he "believed" that gross mishandling of the bone plate "by someone in the hospital" caused scratches which may have led to the failure of the plate. Nonetheless, he agreed that the scratches on the bone plate were consistent with scratches which could have been caused by a screwdriver. In this regard, deposition testimony elicited from virtually every expert witness indicates that the only method of affixing the bone plate to the femur was by screws. Furthermore, Richards admitted in an interrogatory that Dr. Fritsch, the surgeon who installed the bone plate, was not negligent in installing the bone plate even though he may have scratched it during installation.

In determining the genuineness of a factual issue, a court should ignore personal conclusions, opinions, and self-serving statements and consider only facts admissible in evidence under the rules of evidence. *Unzicker v. Chambers* (1972), 8 Ill. App. 3d 992, 996, 291 N.E.2d 231, 234; see also *Schuster v. East St. Louis Jockey Club, Inc.* (1976), 37 Ill. App. 3d 483, 487, 345 N.E.2d 168, 172.

In the case at bar the only evidence in the record which would support Richards in its assertion that a genuine issue of material fact existed was the opinion testimony of Dr. Felbeck. Furthermore, the alleged mishandling of the bone plate by St. Elizabeth's, the crucial issue according to Dr. Felbeck, was by "someone in the hospital who handled the part." This baseless, highly speculative assertion is refuted by evidence that the bone plate was required to be affixed to the femur by screws and that a surgeon installing this bone plate would not have been negligent if he had scratched the bone plate during installation.

Although Richards was not required to prove its case on this issue at the hearing on the motion for summary judgment, it failed to present a sufficient factual basis for its claim that arguably would have entitled it to a judgment under the applicable law. (See *Mortell v. Insurance Co. of North America* (1983), 120 Ill. App. 3d 1016, 1027, 458 N.E.2d 922, 930.) If Richards had evidence of negligence or misuse of the bone plate by anyone outside of its control, it was Richard's duty to either join that party to the lawsuit or, if the party was already joined, to specifically allude to such evidence at the hearing on the motion for summary judgment. Since Richards did not join any additional party and failed to present any factual basis for its as-

sertion that St. Elizabeth's mishandled the bone plate, other than the highly speculative opinion of Dr. Felbeck, the granting of summary judgment to St. Elizabeth's on the issue of implied indemnity was proper.

For the foregoing reasons, the judgment of the circuit court of St. Clair County is affirmed.

Affirmed.

KARNS, P.J., and WELCH, J., concur.