ROBERT ADOLPHSON, d/b/a Adolphson Well Drilling Service, Plaintiff and Counterdefendant and Appellant-Cross-Appellee, v. GARDNER-DEN-VER COMPANY, Defendant and Counterplaintiff and Appellee-Cross-Appellant.

Third District   No. 3—89—0052

Opinion filed April 10, 1990.

Katz, McAndrews, Durkee, Balch & Lefstein, P.C., of Rock Island (Samuel S. McHard, of counsel), for appellant.

Constance A. Schriver and Carole J. Anderson, both of Lane & Waterman, of Davenport, Iowa, for appellee.

PRESIDING JUSTICE HEIPLE delivered the opinion of the court:

The plaintiff, Robert Adolphson, brought suit in 1980 against the defendant, Gardner-Denver Company, for breach of contractual obligation to repair and for breach of implied warranties regarding a water well drilling rig purchased from Gardner-Denver and delivered to Adolphson in 1978. Adolphson sought $747,409.89 in damages representing lost profits, expenses incurred in repairing the rig, and the difference between the value of the rig as warranted and as delivered. Gardner-Denver counterclaimed for $8,775.10 in unpaid invoices plus the costs of bringing this action. The trial court found in favor of Gardner-Denver on Adolphson's breach of contract and breach of warranties claims, and in favor of Adolphson on Gardner-Denver's counterclaim. Both parties appeal the trial court decision.

Adolphson, sole owner of Adolphson Well Drilling Service since 1958, purchased well-drilling equipment from Gardner-Denver since 1968. In 1976, Adolphson was interested in purchasing a new rig, and he attended a 1976 well-drilling convention where he learned about Gardner-Denver's 17W model, a new prototype rig. At that time, Adolphson owned one of Gardner-Denver's 15W rigs, but Adolphson wanted a rig with greater well-drilling capacity than the 15W model. After the convention, Gardner-Denver brought a 17W rig for Adolphson to test on sites which reflected the type of work he does. Adolphson liked many of the features of the 17W prototype rig but also had several criticisms. Gardner-Denver recorded Adolphson's criticisms and told him that the problems would be resolved.

Thereafter, at the 1977 water well-drilling convention, Gardner-Denver representatives allegedly told Adolphson that the 17W rig design had been perfected and the bugs had been worked out of the rig. Additionally, Adolphson was told that the 17W rig would drill twice as fast as his current 15W rig. Further, Gardner-Denver, in

its sales brochure, made several representations about the 17W rig, such as "the versatile CD-17W drill is machined strictly for profitable water well drilling" and the 17W rig is designed for "quick service and lower maintenance." Adolphson then began negotiations to purchase a 17W rig.

On August 30, 1977, Adolphson entered into a purchase agreement with Gardner-Denver to buy a 17W rig for $219,458. Paragraph 15 of the agreement stated:

> "This proposal cannot be changed or varied by any verbal agreements and all orders are accepted under the provisions set forth."

Paragraph 6 of the agreement, which set forth the warranty provisions stated:

> "Subject to the terms and conditions hereinafter set forth, Gardner-Denver Company (the Company) warrants products and parts sold by it, insofar as they are of its own manufacture, against defects of material and workmanship, under use and service in accordance with Company's written instructions, recommendations and ratings for installation, operation, maintenance and service of products, for a period of three months from the date of initial use, provided that such three-month period shall in no case extend beyond one year from the date of shipment by Company. THIS WARRANTY IS LIMITED TO THE REPAIR OR REPLACEMENT, AS COMPANY MAY ELECT, OF ANY DEFECTIVE PARTS, REGARDING WHICH, UPON DISCOVERY OF THE DEFECTS, THE PURCHASER HAS GIVEN IMMEDIATE WRITTEN NOTICE. Installation and transportation costs are not included. Company shall have the option of requiring the return to it of the defective material, transportation prepaid, for inspection. Because of varying conditions of installation and operation, all guarantees of performance are subject to variation of 3%. COMPANY DOES NOT WARRANT THE MERCHANTABILITY OF ITS PRODUCTS AND DOES NOT MAKE ANY WARRANTY, EXPRESS OR IMPLIED, OTHER THAN THE WARRANTY CONTAINED HEREIN. Company has not authorized anybody to make representation of warranty other than the warranty contained herein." (Capitalization in original.)

The 17W rig was delivered to Adolphson in early January 1978. At the planned start-up time, there was extremely cold weather, and the new rig would not start without a start-up kit. In mid-Jan-

uary Gardner-Denver installed a start-up kit and sent one of its repairmen, Bert Jones, to start up the rig. After drilling 50 feet with the new rig, the air compressor was turned on but would not work properly. The 17W rig was then taken to Quincy, Illinois, and underwent repairs for 30 days. During the remainder of 1978 and 1979, numerous mechanical problems arose on the 17W rig. Gardner-Denver responded to these problems by sending replacement parts or sending their repairmen to work on the rig. On August 30, 1978, Gardner-Denver unilaterally renewed the rig warranty for an additional three-month period effective September 1, 1978, and gave a new two-year air compressor warranty to Adolphson. Thereafter, pursuant to verbal representations, Gardner-Denver continued to do warranty work on Adolphson's 17W rig until January of 1980.

At trial, the plaintiff testified that on July 31, 1978, Tony Elegante, a Midwest manager for Gardner-Denver, visited him and made the following representations: (1) Gardner-Denver would stand behind the rig and cure all of its problems; (2) Adolphson would not be left holding the bag if a problem occurred; and (3) they would make sure the continued lost profits would not financially impair Adolphson. Adolphson further stated that Gardner-Denver responded to all of his complaints concerning the 17W rig and that he did not pay Gardner-Denver for any repair costs incurred by Gardner-Denver in 1978, 1979, or 1980. Adolphson claimed that he lost 190 days of production in the first two years of owning the 17W rig, and that in January of 1980 he unsuccessfully tried to sell the rig. Adolphson stated that the 17W rig was down for repairs 19 days in 1980 and down eight days in 1981. Adolphson admitted that 1979 was his most profitable year ever and that the well-drilling market suffered from an economic downturn beginning in 1980 or 1981. Adolphson also acknowledged that he could not separate how much of his lost profits could be attributed to the economy and how much to an increased number of competitors. Adolphson claims lost profits extending over the 10½ years he has been using the 17W rig based on his assessment of how much additional footage he could have drilled if the 17W rig had performed as warranted.

Also testifying for the plaintiff at trial were the plaintiff's expert witness, Dr. Thomas Eaton, and the plaintiff's son, Kerry Adolphson. Dr. Eaton testified that in his opinion the 17W rig was defectively designed. Specifically, Dr. Eaton testified that the one-engine rig design, the omission of a ladder, and the choice of oil were all design defects. Dr. Eaton further testified that the life expectancy of a rig would be "between 5 to 15 years" and "realisti-

cally 7—10." Dr. Eaton testified that when he examined the rig it had been in service for 10½ years and it was in good condition for its age. Additionally, Dr. Eaton stated that Adolphson's rig has operated with no major repairs since 1981.

Kerry Adolphson, the operator of the 17W rig, testified that the rig was not merchantable and that Gardner-Denver's repair work was not adequate to bring the rig up to warranty standards and that numerous problems on the 17W rig have never been adequately resolved. Kerry Adolphson admitted that Gardner-Denver shipped every part he ordered.

Walt Ervin, the owner of another 17W rig, testified in a deposition that he had numerous problems with his rig and that the 17W rig was considered a lemon in the industry. In Ervin's opinion, neither his rig nor Adolphson's rig was fit for the ordinary purpose for which it was intended to be used.

Testifying for Gardner-Denver at trial were Bert Jones, a 23-year employee of Gardner-Denver, design engineer William Bezner, and 17W rig owner Edgar Hurdis. Jones testified that during 1978 and 1979 Gardner-Denver corrected every problem the Adolphsons reported to the company. Jones further testified that after repairs were made to the rig, the Adolphson rig was worth what they paid for it. Bezner, who helped design the 17W rig, testified that the rig was adequately tested and that the design was not defective. Hurdis, who has been operating a 17W rig for 10 years, stated that at first he was frustrated with his 17W rig but the problems were corrected by Gardner-Denver and "any new rig I have ever gotten takes a year or so to square them away." Hurdis thinks the 17W rig is a good machine, very versatile and worth what he paid for it.

After a trial lasting nearly two weeks, Judge Ronald Taber found that Gardner-Denver honored the express warranty set forth in the sales contract fully, that no additional warranties were created, and that the plaintiff failed to prove damages. Further, Judge Taber found that Gardner-Denver failed to support its counterclaim by the required burden of proof.

On appeal, the plaintiff raises three issues: (1) did the trial court err in finding that the only warranty between Gardner-Denver and Adolphson Well Drilling Service was the written warranty printed on the sales contract; (2) did the trial court err in finding the express and implied warranties were not breached; and (3) did the trial court err in not awarding Adolphson damages as a result of the defendant's breaches of warranty? We find that the trial court's judgment in favor of Gardner-Denver on the breach of war-

ranty claims was not against the manifest weight of the evidence and accordingly affirm.

The standard that this court must apply in the instant case is well settled. A reviewing court may not reverse the judgment of a trial court merely because different conclusions could be drawn. (*General Grocer Co. v. Bachar* (1977), 51 Ill. App. 3d 907.) The findings of the trial court will not be disturbed on appeal unless they are clearly contrary to the manifest weight of the evidence. *Peoria Harbor Marina v. McGlasson* (1982), 105 Ill. App. 3d 723.

The plaintiff first argues that representations were made to him before, during, and after he entered into the purchase agreement to buy the 17W rig which created express warranties pursuant to section 2—313 of the Illinois Commercial Code (Ill. Rev. Stat. 1987, ch. 26, par. 2—313). Section 2—313 provides in pertinent part:

"(1) Express warranties by the seller are created as follows:

(a) Any affirmation of fact or promise made by the seller to the buyer which relates to the goods and becomes part of the basis of the bargain creates an express warranty that the goods shall conform to the affirmation or promise.

(b) Any description of the goods which is made part of the basis of the bargain creates an express warranty that the goods shall conform to the description.
* * *

(2) It is not necessary to the creation of an express warranty that the seller use formal words such as 'warrant' or 'guarantee' or that he have a specific intention to make a warranty, but *an affirmation merely of the value of the goods or a statement purporting to be merely the seller's opinion or commendation of the goods does not create a warranty.*" (Emphasis added.) (Ill. Rev. Stat. 1987, ch. 26, par. 2—313.)

The trial court found that the only express warranty that existed was in the purchase agreement and that any other representations that were made, either by Gardner-Denver representatives or in the sales brochures, was "puffing sales language." We cannot find that this ruling was manifestly erroneous.

The proposal Gardner-Denver made to Robert Adolphson in July 1977 and the purchase agreement signed a month later contained the following language:

"This warranty is limited to the repair or replacement, as company may elect, of any defective parts, regarding which,

upon discovery of the defects, the purchaser has given immediate written notice. *** Company does not warrant the merchantability of its products and does not make any warranty, express or implied, other than the warranty contained herein. Company has not authorized anybody to make any representation of warranty other than the warranty contained herein."

In addition, paragraph 15 of the terms and conditions of sale set forth in both of these documents states:

"This proposal cannot be changed or varied by any verbal agreements and all orders are accepted under the provisions set forth."

Adolphson admitted that he understood the terms of the purchase agreement prior to signing the document. Adolphson saw the prototype 17W rig demonstrated and had a month in which to study the proposal, which included the terms and conditions set forth above. Adolphson is an experienced businessman who has been in the well-drilling business since 1958. Under these facts, the trial court could have found that the purchase agreement was a complete representation of the warranties that existed between the parties and that the alleged sales talk and the language found in the sales brochures were merely "commendation of the goods" and did not constitute a promise or description which became a basis of the bargain.

Moreover, under Illinois law the parties must have intended that the representations made were to be construed as a warranty. (*Admiral Oasis Hotel Corp. v. Home Gas Industries, Inc.* (1965), 68 Ill. App. 2d 297.) Here, the trial court was not compelled to believe that Adolphson relied upon sales talk in entering the purchase agreement. This finding is buttressed by the clear language of the purchase agreement and the fact that Robert Adolphson is an experienced businessman who admittedly understood the terms of the contract. Likewise, the trial court was not obligated to accept the plaintiff's argument that the sales brochure created an express warranty. This is especially true given the fact that Adolphson testified that he did not rely on the sales brochure and could not recall whether he first saw it before or after the sale. Further, unlike the *Crest* decision (*Crest Container Corp. v. R.H. Bishop Co.* (1982), 111 Ill. App. 3d 1068), which the defendant heavily relies on, the sales brochure in the instant case was not specifically tailored for the Adolphson sale and only included general statements, such as the 17W rig is designed for "quick service and lower maintenance." Under the facts of the case at bar, the trial court could reasonably

conclude that such statements were not intended to be a basis of the bargain but merely constituted puffing sales language.

Adolphson additionally contends, pursuant to section 2—719(2) of the Illinois Commercial Code, that the plaintiff is not prevented from proving other implied and express warranties outside of the purchase agreement. Section 2—719(2) permits contract modification if a limited warranty fails of its essential purpose. (Ill. Rev. Stat. 1987, ch. 26, par. 2—719(2).) Adolphson argues that the disclaimer of warranties in paragraph 6 of the purchase agreement failed of its essential purpose since repair and replacement of parts did not solve the rig's continuous mechanical problems. Gardner-Denver claims that there was no failure of the disclaimer's essential purpose since the company provided the necessary repairs and replaced defective parts in order to make the 17W rig functional. Testimony was presented that Gardner-Denver responded to all of Adolphson's requests for repairs, that all the parts ordered from the company were delivered, and that Gardner-Denver voluntarily extended the warranty period well beyond the period provided in the purchase agreement. Additionally, evidence was presented that the 17W rig was still operating 10½ years later and that the rig had not undergone major repairs since 1981. Under these circumstances, it was not manifestly erroneous for the trial court to conclude that the limited warranty did not fail of its essential purpose.

Consequently, we hold that the trial court did not err in finding that the only warranty that existed between Adolphson and Gardner-Denver was that contained in the purchase agreement. In so ruling, this court must decide if the trial court erred in finding that the warranty provided in the purchase agreement was breached. The warranty provided in the agreement was limited to the repair or replacement of any defective parts. As previously discussed, there was sufficient evidence presented at trial to support a finding that the defendant corrected all of the mechanical problems on the 17W rig which were reported to the company by Adolphson at its own expense, thus honoring the express warranty fully. Since this court finds that the trial court did not err in ruling that the express warranty was not breached, this court need not address the issue of damages.

Finally, we agree with the trial court that Gardner-Denver failed to prove that they were entitled to $8,775.10 in unpaid invoices for repair parts which was alleged in their counterclaim. From a scrutiny of the record, we are unable to determine whether these invoices for repair parts covered parts furnished under war-

ranty or thereafter, nor is the agreement or expectation of the parties pertaining thereto made clear. There is a presumption in favor of the correctness of the trial court's ruling. To rebut that presumption, the party challenging that correctness is obliged to furnish an adequate record to demonstrate otherwise. That has not been done. Consequently, we must assume that the trial court decision in that regard was correct and entitled to affirmance.

For all the foregoing reasons the decision of the circuit court of Mercer County is affirmed.

Affirmed.

BARRY and SCOTT, JJ., concur.