Benjamin E. Dunham, Plaintiff-Appellee v. Vaughan & Bushnell Mfg. Co., a Corporation, and Belknap Hardware and Mfg. Co., a Corporation, Defendants-Appellants.

Gen. No. 10,802.

Fourth District.

August 31, 1967.

Rehearing denied October 2, 1967.

317

Earl S. Hodges, of Springfield (Samuel S. Patton, of counsel) and Green & Hoagland, of Alton (Robert B. Maucker, of counsel), for appellants.

McGrady and Madden, of Gillespie, for appellee.

TRAPP, J.

Defendants Belknap Hardware and Mfg. Co., hereinafter called Belknap, and Vaughan & Bushnell Mfg. Co., hereinafter called Vaughan, appeal from a judgment in the sum of $50,000 entered upon a jury verdict in favor of the plaintiff Benjamin E. Dunham, for injury incurred when a chip from the head of a hammer entered his eye.

Belknap, using its trade name "Blue Grass," distributes a hammer manufactured by Vaughan. Vaughan manufactures substantially the same hammer for distribution under its own name and also manufactures hammers for another distributor known under the trade name of "Keen Cutter." The hammer at issue was a claw hammer, sometimes known as a carpenter's hammer, weighing approximately 16 ounces and with a length of some 13 inches. Plaintiff obtained it through the Heyen Implement Company, a retail seller of hardware and implements, which is not a party to the suit.

The action is treated by the parties as a products liability case in which plaintiff seeks to impose strict tort liability for a condition of the product under the doctrine announced in Suvada v. White Motor Co., 32 Ill 2d 612, 210 NE2d 182. While the pleadings, at the time the case was submitted to the jury, referred to an action in implied warranty, the parties do not urge the issue as to the pleadings. We note further that the instructions as to the issues in the case, and as to the burden

319

of proof, required the plaintiff to prove the exercise of ordinary care for his own safety. People ex rel. General Motors Corp. v. Bua, 37 Ill2d 180, 226 NE2d 6. These instructions also refer to the affirmative defense of Vaughan alleging that the plaintiff was using the hammer in a violent, unreasonable manner in excess of the purpose for which manufactured and that such use brought about the injury, and "not any defective condition in the hammer."

Each defendant contends that the trial court erred in refusing to direct a verdict, or enter judgment n.o.v., for failure of the plaintiff to prove necessary elements in a case of strict liability in tort, it being urged that there was a failure on the part of the plaintiff to prove: (1) that the hammer was in an unreasonably dangerous condition which existed at the time it left the defendants' control, (2) that he was using the hammer in a manner for which it was designed and intended, and (3) that the court erred in admitting the testimony of several farmers showing a custom of farm users of the hammer to employ it for all manner of farm work, including its use for work upon farm machinery, and for general utility use. This testimony was limited by the trial court to the issue of due care upon the part of the plaintiff, and the jury was so instructed. Belknap contends that, as a wholesaler, it was merely a conduit of the product and that the doctrine of strict liability has no application to it.

The evidence discloses that the hammer at issue was obtained from Heyen Implement Company as a replacement of a hammer, also designated a "Blue Grass" hammer, the handle of which had been broken. The replacement hammer was the same as the replaced hammer, except for a change in the design of the handle. Plaintiff testified that he asked for the best grade of hammer. Plaintiff used the hammer in connection with his farming and custom machine work, and had used it for

repairing a corn crib, but also used it as a hammer in working upon his implements and machinery. At the time of the injury it had been used approximately 11 months. The injury occurred while the plaintiff was connecting his tractor to a manure spreader, which procedure involved the fitting of a pin into a clevis. It appears that he had connected the machinery on one side by inserting the pin. At the time of the injury he was lying on his right side beneath the tractor. In inserting the second pin he used the hammer extended some 2½ feet above his head, the hammer moving through an arc of a stated 8 inches. As he undertook to "tap" the pin into the clevis, a chip from the bevelled edge of the face of the hammer, known as the chamfer, broke off and struck him in the eye. As a result he lost the eye.

Plaintiff insisted in his testimony that he was tapping the pin as distinguished from defendants' contention that he was striking hard, swinging blows. Plaintiff urges that in the position in which he lay, violent blows were impossible. There is only plaintiff's testimony upon this issue.

Both the plaintiff and the defendants presented expert testimony of metallurgists and engineers concerning the condition of the hammer. It was the consensus of the experts that they could find no flaws in the forging of the hammer and that metallurgically there were no defects due to the process of manufacture. It seemed equally the consensus that the use of the hammer produced a condition or state described as "work hardened" and that a "work hardened" hammer was more likely to shear or break off chips. The metallurgical test made showed that the hammer had a Rockwell test hardness of C52, while the pin had a Rockwell test hardness of C57. By Rockwell standards the pin with its C57 hardness is harder than the hammer head, which tested C52. Plaintiff's Exhibit No. 23 consists of certain specifica-

321

tions, adopted by the General Services Administration as approved for the use of all Federal Agencies. A sort of comparison is achieved by noting the following Rockwell "C" hardness specifications: (1) carpenter's claw hammer, 50–60, (the hammer at issue comes within this specification); (2) farrier's hammer (horseshoers), 50–60; (3) machinist's ball peen, 50–57; (4) riveting hammer, 50–57; (5) blacksmith and engineer's hammer, 44–55 and (6) spike maul, 44–55.

As we understand the purpose of the standards, a hammer meets the specification if it comes within the ranges indicated. It would appear that the ranges of hardness in the specifications between the several types of hammers designed for various sorts of work is relatively small and that a blacksmith and engineering hammer, or a ball peen hammer, could meet the respective specifications with a Rockwell hardness C52, and could be used upon a pin with the Rockwell hardness C57, so that they are not clearly distinguishable from the carpenter's hammer.

Each qualified witness expressed the opinion that there were many factors other than the Rockwell C hardness rating involved in the matter of chipping. The witness Siegal suggested that a hammer with a 1050 carbon steel formula would be less likely to chip than a hammer with the 1080 carbon steel formula, as this hammer was. This witness stated an opinion that the harder the steel, the more likely it was to chip.

In Suvada v. White Motor Co., 32 Ill2d 612, 210 NE 2d 182, the Supreme Court stated the elements of proof in strict liability as follows:

> "The plaintiffs must prove that their injury or damage resulted from a condition of the product, that the condition was an unreasonably dangerous one and that the condition existed at the time it left the manufacturer's control."

In this opinion the Supreme Court cited § 402A, Restatement of the Law of Torts, 2d, which refers to "a defective condition." The court also quotes from Justice Traynor in Greenman v. Yuba Power Products, Inc., 59 Cal 2d 57, 27 Cal Rptr 697, 377 P2d 897, wherein he speaks of "defective products." Our court, in stating its rule, speaks of a "condition of the product" rather than a "defective product."

Defendants argue that there was no defect in the hammer when it left the manufacturer or the distributor. While Mr. Justice Traynor has spoken of defects as a deviation from the norm, he has said that there is no definition of a defect which resolves all cases. See 32 Tennessee Law Review, p 363, The Ways and Meanings of Defective Products and Strict Liability. Perhaps the most common notion of a defect is in the sense of a flaw in the product resulting from a miscarriage of a manufacturing process. See Keeton, Products Liability—The Nature and Extent of Strict Liability, 1964, University of Illinois Law Forum, p 692, at p 702. It appears to be essentially in such sense that defendants argue the absence of a defective product. It has been suggested, however, that the case law should progress with the progress of technology and the changing notions of justice, and that "defect must remain an open ended term." See Kessler, Products Liability, The Yale Law Journal, Vol 76, p 887, at p 929.

█ In this case it may be concluded from the evidence that there was no production flaw in the hammer and no step in the process of manufacture which could be criticized by the experts. Upon such contention, the doctrine of Suvada would not apply, for defendants urge that the use of the flawless hammer subsequent to purchase results in "work hardening," and as the hammer attains this condition it may chip and cause injury.

█ The manufacturer of the hammer, however, is held to the degree of knowledge and skill of experts.

323

Harper & James, The Law of Torts (1956), § 28.4, p 1541. The record here discloses that metallurgists and other experts in the field were aware of the effect of the process known as "work hardening" and the hazards that might ensue therefrom. The process of "work hardening" is a characteristic which manifests itself with use. Kessler, Products Liability, The Yale Law Journal, Vol 76, p 887, at p 926. This is particularly demonstrated in Beadles v. Servel, Inc. & Union Gas & Electric Co., 344 Ill App 133, 100 NE2d 405. This was an action for the negligent manufacture and design of a gas refrigerator which, in its operation, deposited soot which accumulated and so restricted the air supply in the refrigerator flame as to cause injury to persons from carbon monoxide. The court pointed out that such manner of construction created a danger in its use as a refrigerator so that each moment of use made it increasingly dangerous, and the fact that the refrigerator had been used for a long period of time did not reflect an absence of defect as a matter of law, "but merely that the defect was more insidious than sudden in its capability to cause harm." The pleading described the condition as a "propensity for harm." The Appellate Court reversed the action of the trial court which dismissed the pleading for failure to state a cause of action.

In Crane v. Sears Roebuck & Co., 218 Cal App2d 855, 32 Cal Rptr 754 (1963), there was no defect in a mixture designated "surface preparer" sold by the defendant for use in painting. The mixture was labelled inflammable and there was warning of poisonous fumes, but no warning that the fumes were explosive in a confined area. There was an explosion which injured plaintiff. That court, deciding the case upon the concept of strict liability, noted that the mixture ". . . contained latent dangerous characteristics against which it was incumbent to protect during handling and use, with respect to which appropriate warning must be given the public."

Again, in Gherna v. Ford Motor Co., 55 Cal Rptr 94 (1966), the plaintiff's automobile caught fire. In an action for damage to property, there was evidence among other things that under certain conditions the oil in the automatic transmission would boil, and could cause a fire if it boiled onto a hot manifold. The court said:

> "A manufacturer, as well as a dealer, must give adequate warning to the ultimate users of the product of any dangerous propensity which it knows or should have known would result in the type of accident that occurred."

The court stated that a product faultlessly made may be deemed "defective" if it is unreasonably dangerous to place the product within the hands of a user without suitable warning. Restatement of the Law of Torts, 2d, § 402A, in its Comment (h), states that if the producer of a product has reason to anticipate that danger may result from a particular use, he may be required to give adequate notice of the danger, and a product sold without such warning is in a defective condition.

■ Prosser, The Fall of the Citadel, 50 Minnesota Law Review, p 791, at p 826, states that:

> "The product is to be regarded as defective if it is not safe for such a use that can be expected to be made of it, and no warning is given."

Rather than requiring an element of a physical flaw in the product, we believe that the duty contemplated by the court in Suvada is one of making the chattel safe for the use for which it is supplied. See Prosser, The Law of Torts, Second Edition, p 84.

■ ■ We believe that the liability imposed by Suvada requires that the manufacturer or seller must take reasonable precautions in the light of dangerous propensities that are, or should be, known. What, if any,

325

precautions are required, is a question that will vary with the circumstances and will depend upon the balancing of the likelihood of harm, and the gravity of harm, if it happens, against the burden of the precaution which would be effective to avoid the harm. Harper & James, The Law of Torts, § 28.4. This is particularly so when the condition or propensity of the product is likely not to be fully known and appreciated by those using it, and the article is likely to be put to a use unreasonably dangerous without such knowledge. Harper & James, The Law of Torts, § 28.7. Keeton, in Products Liability—Liability Without Fault and the Requirement of a Defect, 41 Texas Law Review, p 855, suggests that the best test of what is legally defective is found in what the consumer expects and customarily guards against.

██ There is some evidence in this case upon the issue of defendants' actual knowledge of the propensity to chip. In addition to the knowledge of an expert imposed upon the manufacturer, the "specifications" for hammers placed in evidence include the requirement that the hammers be tested for chipping. There is also in evidence a certain catalog prepared by Vaughan for its own hammers, which contains a form of warranty advising of the danger of injury from misuse of the hammer, although neither misuse nor the danger are described. The testimony of Heyen's clerk includes statements that he had replaced hammers with chipped heads for plaintiff. The Abstract further discloses that when the retailer, Heyen, replaced a defective hammer, such hammer was returned to Belknap and the retailer received credit, or was otherwise made whole upon the transaction. There is also evidence that Vaughan gave credit to Belknap where defective hammers had been replaced. Thus there is some evidence for the consideration of the jury as to the knowledge of the respective defend-

326

ants that defects of a nature justifying replacement of their respective lines of hammers were known to them.

■ Defendants urge that there was a failure to prove that the condition of the hammer was unreasonably dangerous. In Suvada the Supreme Court was not called upon to define, or delimit the term "unreasonably dangerous." Ozmon, in Products Liability under the Suvada Theory, 55 Illinois Bar Journal, p 906 at p 915, suggests that the term is not limited to the extremely, or inherently, dangerous product. In Restatement of the Law of Torts, 2d, § 402A, Comment (i), says:

> "The article sold must be dangerous to an extent beyond that which would be contemplated by the ordinary consumer who purchases it, with the ordinary knowledge common to the community as to its characteristics."

A homely comparison might be made by saying that the ordinary consumer would guard against hitting his thumb with a hammer, but would not necessarily contemplate being struck in the eye by a hammer chip. Noel, in 71 The Yale Law Journal, p 816, at p 819, Manufacturer's Negligence of Design or Directions for Use of a Product, suggests that whether or not an unreasonable danger is created should be determined by general negligence principles which involve balancing the likelihood of harm and the gravity of harm, if it happens, against the burden of precautions which would be effective to avoid the harm. See also Harper & James, The Law of Torts, § 28.4. We believe that the opinion in Suvada reaches this conclusion in its discussion of Wiedeman v. Keller, 171 Ill 93, p 99, 49 NE 210, and Lindroth v. Walgreen Co., 407 Ill 121, 94 NE2d 847.

■ The defendants argue that the plaintiff failed to prove that the hammer was unfit for the particular use for which it was designed, and failed to show that

the use of the hammer was reasonable and ordinary. We suggest that there is a distinction between the intended use and the foreseeable use, and that where a particular use should be known to the reasonably prudent manufacturer such use cannot be labelled unforeseeable. If we correctly interpret Suvada, with its suggestion that applicable principles of negligence would be applied to achieve the objectives of the doctrine of strict liability, foreseeability would be the standard enforced rather than that of the manufacturer's intention. There may be a distinction between an unusual use which the manufacturer is required to anticipate and an abnormal use for which he is not responsible. 18 The Hastings Law Journal, p 38, citing Phillips v. Ogle Aluminum Furniture, Inc., 235 P2d 857. There it was held that the manufacturer of a chair should foresee that a person might undertake to stand upon the chair. It has been said that in establishing a duty, contemporary courts generally weigh the difficulty in predicting and eliminating the risk of injury from the use against the gravity, both in probability and in magnitude of the risk, and of the user's reliance on defendant's ability to discover and prevent latent defects. Where the use is extremely unconventional and the cost of discovery to prevent the danger is excessive, a duty generally has not been imposed, but where the cost of prevention is minimal and the degree of reliance is high and the gravity of the risk substantial, a tort duty has generally been imposed. 42 New York University Law Review, p 381. This principle is followed in Illinois in Hardman v. Helene Curtis Industries, Inc., 48 Ill App2d 42, 198 NE2d 681.

■■ Lascher, in Strict Liability in Tort for Defective Products—The Road To and Past Vandermark, 38 Southern California Law Review, p 30 at p 50, undertakes to criticize instructions developed in California, which included the language:

*". . .* provided the article was being used *reasonably* for the purpose for which it was designed and intended to be used."

He urges that strict liability will apply where the use involved in the injury is anything within the whole general species of use to which the chattel may be expected to be put, and that it is not the "particular use," but rather the "general type of utilization" which must be within the contemplation of the ordinary merchandiser or manufacturer and the ordinary consumer. Ozmon suggests that normal use must depend upon who uses the article and the circumstances of the use. Products Liability Under the Suvada Theory, 55 Illinois Bar Journal, p 906. It may be noted that a hammer is an implement of beguiling simplicity, and there is probably no artifact with so many uses, real or fancied. No one is in awe of the art of using a hammer, and everyone, or anyone, deems himself competent to employ it, albeit, artfully or in frustration. It is to be found in many households, and children, from the time they are able to lift the artifact, can use it with enthusiasm, although the benefits may be dubious. A hammer is a hammer to most people and limitations in the implement, or its age, fitness and condition, are not apparent to the unsophisticated. It should be reasonably safe for the purposes for which it is intended and for other uses which are foreseeably probable. Harper & James, The Law of Torts, § 28.4, p 1541. The standard imposed is the use which a reasonable manufacturer would anticipate as likely enough to be taken into account. Where the likelihood of a dangerous use is less clear under the circumstances, it will be a question for a jury whether the maker should have anticipated it. Harper & James, § 28.6, p 1546. The article by Noel, Manufacturer's Negligence of Design or Directions for the Use of a Product, 71 The Yale Law Journal, p 816, at p 877, states that the considerations which have controlled in negligence cases upon the use of ab-

normal or careless use would probably continue to be of significance.

 The doctrine announced in Suvada does not refer to an intended use of the manufacturer. We are persuaded by the determination of the court in Hardman v. Helene Curtis Industries, Inc., 48 Ill App2d 42, 198 NE2d 681, where it is said that the question of what constitutes an ordinary use is clearly a question of fact and that the foreseeability of careless use is a matter for a jury, unless the use of the product was, in fact, so unintended and unforeseeable that the case should be taken from the jury.

Upon the issue of intended use and the purpose for which the hammer was designed, we have not found any evidence in the Abstract which undertakes to specify the use, or to limit the purpose of design of a claw hammer so far as a purchaser or user is concerned. The presence of the claws upon the hammer might cause one to infer that it was more convenient for use in carpentry than a ball peen hammer, but such conclusion would not necessarily certify knowledge that its use as a striking instrument was limited to nails or wood. There is no necessary inference that for use as a hammer it is any different than a ball peen hammer. We cannot say, as a matter of law, that under the evidence in this record, one who purchases a carpenter's claw hammer is bound to know the difference between the divers categories of hammers with reference to their particular function of hammering.

Defendants urge that the court erred in admitting into evidence testimony of 5 witnesses as to the custom of farmers within the community to use claw hammers, not only for carpentry work, but for driving steel pins, metal drills, metal shafts and posts, cold chisels and for work upon machinery, and in the giving of plaintiff's Instruction No. 15 relating to such testimony. The trial court limited the testimony to the purpose of showing

330

due care on the part of the plaintiff, and Instruction No. 15 advised the jury that it might consider such evidence in determining whether or not plaintiff acted as a reasonable and prudent person would act under circumstances similar to those in evidence, pointing out in the Instruction that negligent acts do not cease to be negligent because they are frequent, but that proof of a customary method of doing an act by those who frequently perform it ". . . is some evidence as to whether the method is, or is not, negligent."

 It is argued that contributory negligence of the plaintiff is not a defense in a products liability case. We interpret the language of Bua to state that freedom from contributory negligence is an element to be proven, both in products liability and warranty cases. Contributory negligence in a products liability case may be properly an issue, for while it is said that the plaintiff is not required to discover a defect, or to guard against the possibility of its existence, on the other hand, if he discovers a defect, or if the danger in use is known to him and he proceeds to use it, he may be guilty of contributory negligence. Restatement of the Law of Torts, 2d, § 402A, Comment (n); Traynor, 32 Tennessee Law Review 363—The Ways and Meanings of Defective Products and Strict Liability; and Prosser, The Fall of the Citadel, 50 Minnesota Law Review, p 791. We believe the issue particularly relevant since the testimony of Heyen's clerk, Weidner, suggests that the plaintiff had presented for replacement a carpenter's hammer with a chipped head. Again, the cross-examination of plaintiff suggests, but does not make specific, the fact that he had had experience with hammers that had chipped as he was using them.

 In Gard, Illinois Evidence Manual, Rule 105 states that an act in accordance with established custom may be relevant on the question of the standard of duty and care to determine due care in a given case. This

rule is followed in McNealy v. Illinois Cent. R. Co., 43 Ill App2d 460, 193 NE2d 879, it being pointed out that customary methods do not determine conclusively the fact of the exercise of due care, but is evidence which can be considered by the jury. We believe that the instruction was properly limited and correctly stated the law.

The defendants contend that plaintiff's Instruction No. 14 was error. This instruction set forth the language of § 402A, Restatement of the Law of Torts, 2d, and concluded with the paragraph:

> "If you decide that any party defendant violated the principles above stated on the occasion in question then you may consider that fact together with all the other facts and circumstances in evidence in determining whether or not that party is liable."

We suggest that the instruction given imposes a greater burden upon the plaintiff than would probably be required by reason of the elements of proof stated in Suvada.

At the instruction conference Vaughan objected to the instruction upon the ground that there was no evidence of a defect. We believe this objection is covered in this opinion. Vaughan further objected upon the ground that the evidence did not show a sale of the hammer and that the language of the instruction refers throughout to a sale, or seller.

██ ██ Suvada itself does not refer to a "sale" or a "seller." Upon the issue of a sale of the product and the fact that the instruction referred to a seller, in De Laney v. Towmotor Corp., 339 F2d 4, a forklift truck of new design was delivered as a demonstrator. The operator was injured by the collapse of an overhead guard. In an action found in strict liability, the issue of the language of § 402A, Restatement of the Law of Torts, 2d, was raised. The court said:

"But we think the Court of Appeals (NY) would regard this, as we would, as a description of the situation that has most commonly arisen rather than as a deliberate limitation of the principle to cases where the product has been sold, intentionally excluding instances where a manufacturer has placed a defective article in the stream of commerce by other means."

As a matter of fact, for purposes of this case, we would conclude that the replacing of a defective hammer, as is shown by the evidence, creates such a relationship as comes within the meaning and purposes of a cause of action under Suvada.

■ At the instruction conference, Belknap objected to plaintiff's Instruction No. 14 upon the ground that it did not define an implied warranty, nor did it use the language of implied warranty. No tender of such instructions by Belknap is shown in the Abstract. We have, furthermore discovered scholarly authority that the strict liability theory is essentially the liability of implied warranty divested of the contract doctrines of privity, disclaimer and notice. See Kessler, Products Liability—76 The Yale Law Journal, p 887 at p 928; Prosser, The Assault Upon the Citadel (Strict Liability to the Consumer), 69 The Yale Law Journal, p 1099 at p 1143; and Lascher, Strict Liability in Tort for Defective Products—The Road To and Past Vandermark, 38 Southern California Law Review, p 30 at p 46.

■■ In this appeal defendants argue that the instruction directs a verdict and assumes a defective condition which was unreasonably dangerous, and that the instruction failed to advise the jury that the defendants were not insurers. The instruction as to plaintiff's burden of proof requires the jury to find both the defective condition and an unreasonably dangerous condition. The series of instructions also requires them to reach their verdict from the consideration of all of the evidence. As

to the failure of the instruction to advise the jury that the defendants were not insurers of the injury of the plaintiff, we find nothing in the Abstract to show that the defendants raised such objection at the instruction conference, or tendered an instruction to the court upon this element. Considering the instructions as a series, we conclude that giving the instruction is not reversible error.

██ Belknap contends that the record discloses that it was simply a conduit of the hammer, and that no duty should be imposed upon it for purposes of liability in this proceeding. We note first that it is a hammer under the trade name used by Belknap, and it has been said that one who holds himself out to be the manufacturer by placing his insignia thereon may be held as if he were the manufacturer. Lill v. Murphy Door Bed Co. of Chicago, 290 Ill App 328 at p 329, 8 NE2d 714. The language of Suvada itself is all inclusive as to the parties in a chain who places the article into commerce. Prosser, in The Law of Torts, 3rd ed, chapter 19, § 97, p 862, discusses the liability of retailers and wholesalers saying:

> "All of the valid arguments supporting strict liability would appear to apply with no less force against both kinds of dealers; and there are enough cases where the manufacturer is beyond the jurisdiction, or even unknown to the injured plaintiff, to justify giving the consumer the maximum of protection, and requiring the dealer to argue out with the manufacturer any questions as to their respective liability. Particularly today, when the large wholesale supply house or even the retail chain is often actually the prime mover in marketing the goods, and the manufacturer only a small concern which feeds it, there is no reason to draw distinctions between different kinds of sellers."

██ The defendants have called our attention to Odekirk v. Sears, Roebuck & Co., 274 F2d 441. In that case the defendant, Vaughan, was a party-defendant. There the plaintiff used a claw hammer to strike another hammer and a chip flew into his eye. There was an action for warranty and negligence. The court admitted conflicting evidence upon the issue of custom and usage of a hammer, as done here. The court affirmed the special finding of a jury that the plaintiff was 100 percent contributorily negligent, holding that such verdict was not erroneous as a matter of law. We believe that Odekirk simply demonstrated that the issues of defect, foreseeability and freedom from contributory negligence are properly issues to be presented to the jury.

The judgment below is affirmed.

Affirmed.

CRAVEN, P. J. and SMITH, J., concur.