STATE FARM FIRE AND CASUALTY COMPANY, as Subrogee of John J. Kurkjian, *et al.*, Plaintiffs-Appellees and Cross-Appellants, v. MILLER ELECTRIC COMPANY, a Division of Carol Cable Company, Inc., Defendant-Appellant and Cross-Appellee.

Second District   No. 2—90—0040

Opinion filed October 11, 1990.

REINHARD, J., specially concurring.

George E. Krippner, of Clancy & Krippner, of St. Charles (Kathleen K. Watson, of counsel), for appellant.

Michael D. Fabing, of Warsawsky, McNeal, Fabing & Associates, of Chicago, for appellee Keith Consago.

Guerard, Kalina, Musial, Ulrich & Varchetto, of Wheaton (Louis A. Varchetto, of counsel), for other appellees.

JUSTICE INGLIS delivered the opinion of the court:

Defendant, Miller Electric Company, a division of Carol Cable Company, Inc., appeals from a judgment entered on a jury verdict in favor of plaintiffs, State Farm Fire and Casualty Company (State Farm), as subrogee of John, Arlene, and Gary Kurkjian (the Kurkjians), and Keith Consago. Defendant contends that: (1) the trial court erred in not entering judgment based on the special interrogatory; (2) the jury's verdict was internally inconsistent and should have been vacated; (3) the jury's verdict was against the manifest weight of the evidence; and (4) the trial court erred in allowing plaintiff to conduct an in-court experiment.

Plaintiffs have also filed a cross-appeal in this case, arguing that the trial court abused its discretion in failing to award them reasonable attorney fees and costs.

On June 26, 1985, a fire destroyed a substantial portion of a residence which the Kurkjians' owned. On March 19, 1987, State Farm filed a four-count complaint in the circuit court of Du Page County. Count I was premised on strict liability in tort; count II alleged negligence; count III alleged a breach of the implied warranty of merchantability; and count IV involved the Magnuson-Moss Warranty-Federal Trade Commission Improvement Act (Act) (15 U.S.C. §2301 et seq. (1976)). On June 9, 1987, the trial court granted defendant's motion to transfer venue to Kane County. On June 24, 1987, Keith Consago filed a complaint alleging the same four counts as State Farm did. Both plaintiffs dismissed the negligence counts prior to trial.

The following facts were adduced at trial. John Kurkjian testified that he owned a house in Geneva, Illinois, and leased it to his son, Gary, and Keith Consago. Kurkjian stated that he went to the property on June 26, 1985, at approximately 7 a.m., after receiving a telephone call concerning the fire. He was met there by two State Farm representatives, who then proceeded to inspect the property.

Patrick McGinnis, an inspector for State Farm, testified that he inspected the home shortly after the fire. McGinnis indicated that

Gary's bedroom sustained the most damage from the fire. He further indicated that he could smell smoke in the house during the inspection, but did not detect any other odors. He also requested to inspect an extension cord to determine if it was defective and was possibly the cause of the fire.

Gary Kurkjian testified that neither he nor Keith Consago was in the house at the time of the fire. Gary indicated that he purchased an extension cord so that he could use an electric razor in a bathroom which contained no electrical outlets. The cord was approximately 10 feet long and ran under a door leading into the bathroom. Gary stated that the door did not "pinch" the cord at any time and that he never noticed any damage to the cord. He also indicated that a weight set was located near the extension cord, but it never damaged or pinched the cord. Gary denied starting the fire and also denied smelling gasoline or kerosine in the house after the fire.

On cross-examination, Gary testified that, after viewing photographs of the bathroom in question, there appeared to be an electrical outlet in the bathroom, but he could not recall if it was functional. He also agreed with defense counsel that he was in the process of dissolving a general contracting business with Consago at the time of the fire.

Gerald Koster, a Geneva fire fighter, testified that he arrived at the house when the fire was still in progress. After extinguishing the fire, Koster began investigating its cause. Koster noted that the north bedroom sustained the most damage from the fire. Koster stated that arson was eliminated as a cause of the fire because of the pattern of the fire, the absence of any odors associated with petroleum-based accelerants, and the amount of damage which the fire caused. Instead, the cause of the fire was determined to be "accidental in nature and that cause was an electrical short in an extension cord plugged into the south wall which ignited nearby combustibles." Koster removed the extension cord, along with the razor and the electrical outlet cover plate, from the house after the fire.

On cross-examination, Koster stated that he completed one 40-hour course on fire investigation prior to his investigation in the present case. Koster then described the fire fighting and investigative techniques used to combat the fire. He stated that the electrical power was on when the fire fighters arrived at the house but was shut off shortly thereafter. After putting the fire out, the investigation began. Koster took several photographs of the damage and agreed with defense counsel that one of the photographs indicated the presence of a "splash pattern," an indication of the possible use of flammable liq-

uids. He also agreed that a bent window frame in the bedroom was a possible indication of a forced entry into the house.

Koster further indicated that the extension cord recovered from the bedroom had "beaded copper" at the end of the positive line. The bead at the end of the line was evidence of a short, although not "positive proof." Koster also stated that he checked the fuse box in the house to determine if the circuit "was in fact flowing power at the time of the incident." None of the fuses were blown. He pointed out that normally the fuses would have blown if an electrical short had occurred.

Koster was also questioned regarding the use of a sniffer, a device used to detect flammable gasses. Koster stated that the Geneva fire department uses the device to track the source of liquid fuel spills or natural gas leaks. He indicated that the device was unreliable in fire investigations because it registers a large number of gasses, including those actually produced by combustion. The sniffer also is unable to distinguish between different types of gasses.

On redirect examination, Koster again stated that it was his opinion that a short in the electrical extension cord was the cause of the fire.

Paul Hansen, an engineer for Craig Engineering, Inc., testified that he examined the extension cord and razor at issue in this case. It was Hansen's opinion, after examining the items, that the extension cord was defective and did, in fact, cause the fire at the Kurkjian residence. He based his opinion on his observation of a defect in the insulation in the cord approximately one foot from the plug. Hansen indicated that the defect would not cause a short circuit, but instead resulted in a "leakage of current that increased progressively with time." At some point, the insulation carbonized and an electrical arc developed. After the arc developed, the temperatures would reach 4,000° Farenheit, which would be great enough to melt copper. Hansen explained that this was the reason why the copper beads were found at the end of the extension cord.

Hansen further explained his opinion of how the electrical arc started the fire in this case. He stated:

> "An arc will continue until the point where, number one, it extinguishes itself; in other words, the wires get far enough apart that you can't conduct electricity and the arc becomes extinguished, or the other possibility is that these—in this case, if the two wires fuse together causing a direct electrical short and the circuit breaker can then act upon the wire and up the circuit and eliminate the current to it and no more heat is made. But in the

meantime, you had this getting very, very hot and it had to have ignited nearby combustibles and started the fire." Hansen further opined that the cord was defective and in a dangerous condition at the time it left the manufacturer.

On cross-examination, Hansen indicated that the extension cord did not violate any of the industry's codes or standards. He also agreed with defense counsel that he did not state that there were any manufacturing defects in the product in his report made after inspecting the cord. He also agreed that there was not a great amount of heat where the bead on the cord was located because the cord was flexible at that point.

Hansen further testified that simply because a manufacturer is following industry standards does not necessarily mean that an extension cord could not leave the factory with a defect. This was the case because the standards and codes described the type of materials to be used and the specifications of the product, without addressing how the product should actually be manufactured. He reiterated his opinion that enough heat could be generated in the extension cord to cause a fire without actually blowing a fuse.

Robert Rose, the vice-president of defendant, testified that his company manufactured and sold the extension cord at issue in this case. He indicated that defendant has obtained the Underwriter's Laboratory (U.L.) seal for manufacturing electrical extension cords to certain required specifications. He also indicated that U.L. inspects and tests samples of the product which U.L. selects on a random basis.

Keith Consago testified that he lived with Gary Kurkjian at the time of the fire. Consago stated that the extension cord was plugged into an outlet in Gary's bedroom and was used in the bathroom because there wasn't a usable outlet in the bathroom. Consago did not notice any physical damage to the cord at any time prior to the fire. Consago further stated that he did not set the fire to the house. After Consago testified, plaintiffs rested. Defendant's motion for a directed verdict was denied.

Robert Bambenek, a consulting research engineer, then testified that defendant hired him to investigate the fire at issue in this case. Bambenek stated that he went to the fire scene approximately $2\frac{1}{2}$ years after the fire occurred to conduct his own investigation. He used an electronic sniffer in the house and discovered a "strong indication of a flammable vapor being present." He also took several photographs of the house. After surveying the house and examining the photographs and extension cord, Bambenek concluded that there was no evidence of any defect in the cord. He noted that the arc damage in the

cord was the result of being "looped over itself during a fire as opposed to the type of arc damage which would occur if the cord contained a defect." Had the cord contained a defect, it would have been brittle and would have had a greater amount of damage done to the conductors. He also concluded that the fire did not start near the outlet where the cord was plugged in. He based this opinion on the patterns of burn marks on the walls in the bedroom.

Bambenek indicated that it was his opinion that there were three highly probable causes of the fire: (1) that the fire was set by someone using an accellerant, including gasoline, kerosine, or fuel oil; (2) the extension cord was "pinched" by the door or the weight set; or (3) something heavy fell on the cord. He was unable to choose which of the three possible causes was the actual cause of the fire due to a lack of data and evidence.

On cross-examination, Bambenek stated that it was possible, but not probable, that the cord was defective and caused the fire. He also agreed with counsel for State Farm that the house was in a substantially different condition on the day he inspected it than it was on the day of the fire. He noted that the debris had been cleared out, and all drywall, flooring, and baseboards had been removed.

Bambenek also stated that there was no evidence, other than his sniffer readings and burn patterns, that the fire was set. He also noted that his theory concerning the possibility that the door pinched the cord would be valid only if the extension cord was 15 feet long. In addition, his theory concerning the possibility that a heavy object, such as the weight set, fell on the cord and caused the damage would be valid only if the weight was on the cord for a long period of time to "provide an extremely high local pressure."

The trial court also allowed counsel for Keith Consago to conduct a demonstration, over defendant's objection, using the sniffer. Counsel had Bambenek pour two or three drops of naphtha, a petroleum distillate used in cigarette lighters, on a piece of paper. The sniffer detected the presence of a flammable vapor after he did so. After six minutes, Bambenek was able to detect "[a] little but not as much." He agreed with counsel that there would be virtually none of the naphtha vapors left after another five minutes.

On redirect examination, Bambenek stated that the result of his in-court experiment would have been different had he used a heavier petrochemical distillate and poured it on a piece of wood flooring. He noted that a wood floor, like that present in the house, has "a lot of interspacial spaces or nooks and crannies where the liquid can go and be retained by adsorption as well as capillary action."

After Bambenek's testimony, defendant recalled Robert Rose to testify and then rested. Following closing arguments, the jury returned a verdict in favor of plaintiffs on count III (breach of the implied warranty) and in favor of defendant on count I (unreasonably dangerous product). Damages were awarded to State Farm in the amount of $55,562.77 and to Consago in the amount of $7,200. The jury also answered the following special interrogatory:

> "Did a defect or defects exist in the extension cord when it left the manufacturer's control which made the extension cord unreasonably dangerous?
>
> Yes _____<br>No _____ X _____"

Following arguments of counsel, the trial court entered judgment on the jury's verdict. Defendant filed a timely notice of appeal.

On May 19, 1989, State Farm filed a petition requesting the court to award it $17,122.09 in attorney fees and expenses pursuant to section 110(d)(2) of the Act (15 U.S.C. §2310(d)(2) (1976)). On May 26, 1989, Consago filed a similar petition requesting $13,253.82 for attorney fees and expenses. Following two separate hearings, the trial court denied the petitions. With respect to State Farm's petition, the court stated:

> "In the sound exercise of judicial discretion, the court finds the award of fees to be not appropriate, and also notes that no evidence has been offered as to their reasonableness or necessity. There is nothing in evidence on those issues."

As to Consago's petition, the court indicated:

> "It was not only a close question on liability. I would be a little stronger in my choice of words and describe it as a very questionable liability case. It did present an issue of fact for the jury. I find no bad faith in the denial of liability in the case. I find it to be very inappropriate to award attorney's fees or costs in light of the totality of the circumstances about this case, so the motion and petition are denied."

Both plaintiffs filed timely notices of appeal.

We will first address the issues raised in defendant's appeal. Defendant first contends that the trial court erred in not entering judgment based on the special interrogatory. Defendant points out that the jury's finding that no defect existed when it left the manufacturer's control was fatally inconsistent with its finding in favor of plaintiffs on the implied warranty of merchantability count.

Initially, we must consider plaintiffs' argument that defendant waived its contention concerning the inconsistent verdicts. Plaintiffs

assert that defendant failed to object to the jury instructions and verdict forms in this case and also failed to tender alternative forms to support its argument on appeal, thus resulting in a waiver of the argument on appeal. See *Deal v. Byford* (1989), 127 Ill. 2d 192, 202-03.

■■ We find that defendant did not waive its right to contest the alleged inconsistencies in the verdicts rendered in this case. During the trial, plaintiffs utilized the same evidence to support two separate but similar theories of recovery. Thus, by necessity, there was a possibility that the jury would return verdicts which were inconsistent. This is. apparently the reason why the trial court agreed to use a special interrogatory to test the jury's general verdict. During the instructions conference, counsel for defendant stated:

> "As I understand the law, I have a right to submit a special interrogatory to test the general verdict. I believe this interrogatory does that in that if the jury finds there was no defect in the product when it left the manufacturer's control, there is no basis for the general verdict for the plaintiffs to stand under either count of the complaint."

The court then stated: "It's given."

We note that defendant did raise its argument concerning the alleged inconsistent verdicts in its post-trial motion. Under the facts in this case, we find that defendant did provide the trial court with a sufficient opportunity to consider the merits of its argument, thus preserving the alleged error for appeal.

■■ ■ Section 2—1108 of the Code of Civil Procedure (Ill. Rev. Stat. 1989, ch. 110, par. 2—1108) provides that, "[w]hen the special finding of fact is inconsistent with the general verdict, the former controls the latter and the court may enter judgment accordingly." Thus, the relevant inquiry is whether the answer to the special interrogatory is inconsistent with the general verdict. (*Ciborowski v. Philip Dressler & Associates* (1982), 110 Ill. App. 3d 981, 989.) If it is inconsistent, and the answer to the special interrogatory is not against the manifest weight of the evidence, then judgment should be entered based on the special interrogatory rather than on the general verdict. (*Sangster v. Van Hecke* (1977), 67 Ill. 2d 96, 100; *Borries v. Z. Frank, Inc.* (1967), 37 Ill. 2d 263, 265-66; *Ciborowski*, 110 Ill. App. 3d at 989.) As *Borries* pointed out, the reason for this rule is that a jury more clearly understands a particularized special interrogatory than a composite of all the questions in a case. 37 Ill. 2d at 266.

■■ In determining whether the special finding was inconsistent with the general verdict, the evidence itself should not be considered. (*Ciborowski*, 110 Ill. App. 3d at 989.) Furthermore, all reasonable pre-

sumptions must be exercised in favor of the general verdict. 110 Ill. App. 3d at 989.

In the present case, defendant argues that the answer to the special interrogatory was inconsistent with the general verdict as a matter of law. Defendant contends that plaintiffs were required to prove that the extension cord was defective at the time it left the manufacturer's control before they were entitled to recover under either theory of liability before the jury. However, the jury found in favor of plaintiffs on the implied warranty count and in favor of defendant on the strict liability count.

■ Other courts have been faced with similar situations in determining the relationship between these two theories of liability. This court has previously stated:

> "[T]he theories of breach of implied warranty and strict liability are nearly identical. It has been stated that a breach of implied warranty theory is a form of strict liability without the necessity of proving negligence or fault on the part of the defendant. [Citation.] '[T]he strict liability theory is essentially the liability of implied warranty divested of the contract doctrines of privity, disclaimer and notice.'" *Nave v. Rainbo Tire Service, Inc.* (1984), 123 Ill. App. 3d 585, 592-93, quoting *Dunham v. Vaughan & Bushnell Manufacturing Co.* (1967), 86 Ill. App. 2d 315, 333, *aff'd* (1969), 42 Ill. 2d 339.

Furthermore, the court in *141 South Main, Inc. v. Magic Fingers, Inc.* (1977), 49 Ill. App. 3d 724, addressed a similar case involving products liability and breach of implied warranty of merchantability counts. The court addressed the plaintiff's argument by analyzing both counts under the same heading. (*141 South Main*, 49 Ill. App. 3d at 727.) The court indicated that one of the elements that the plaintiff must prove in its *prima facie* case was that the "condition existed at the time it left the defendant's control." 49 Ill. App. 3d at 727.

A similar situation to the case at bar was presented in *Livingston Service Co. v. Big Wheels, Inc.* (1981), 96 Ill. App. 3d 591. In *Livingston*, the plaintiff's fertilizer spreader caught on fire and burned. The plaintiff sued the manufacturer of the vehicle, alleging a breach of the implied warranty of merchantability, along with a strict liability for defective products count. The court held that the plaintiff, under both counts, must establish that there was a defect in the vehicle which existed at the time it left the defendant's possession. *Livingston*, 96 Ill. App. 3d at 593.

■ We agree with the reasoning in *Livingston* and hold that plaintiffs were required to prove that a defect existed in the extension cord

before they could recover on either count. It is evident that the presence of a manufacturing defect was the only way in which plaintiffs' proof suggested that the extension cord was unmerchantable. Paul Hansen, an engineer who testified for plaintiffs, stated that it was his opinion that the extension cord caused the fire due to a defect in the insulation of the cord. Hansen further indicated that the defect existed at the time the cord left the manufacturer's control and resulted in an electrical current leak which "increased progressively with time." Thus, in order for the jury to render a verdict in favor of plaintiffs, it must have found that there was a defect in the cord. However, it answered in the negative a special interrogatory concerning the existence of a defect.

■ We believe that the jury's answer to the special interrogatory was inconsistent with its verdict rendered on the breach of warranty count. Under the proof elicited in this case, either a defect existed in the cord which caused the fire, or no defect existed. Given that the jury answered the special interrogatory by determining that no defect existed, we must reverse the jury's general verdict in favor of plaintiffs on the breach of implied warranty count based on this inconsistency. In doing so, we note that there was sufficient evidence to support the jury's answer to the special interrogatory, and thus its answer was not against the manifest weight of the evidence. See *Borries*, 37 Ill. 2d at 265-66; *Ciborowski*, 110 Ill. App. 3d at 989-90.

In making our determination, we are mindful of the decision in *Malawy v. Richards Manufacturing Co.* (1986), 150 Ill. App. 3d 549. In *Malawy*, the court determined that the plaintiff was not required to establish evidence of a defect in a product in order to recover for a breach of an implied warranty. (*Malawy*, 150 Ill. App. 3d at 559-60.) The court indicated that the relevant inquiry in an implied warranty case was whether the product conformed to the standards of merchantability, as established by the contractual relationship. (150 Ill. App. 3d at 560.) Thus, evidence of a defect in the product was merely evidence of nonconformity according to *Malawy* and was not required in order to prevail on a breach of an implied warranty of merchantability cause of action.

We, however, decline to follow the rationale espoused in *Malawy*. Instead, we agree with the line of cases which has recognized the inherent similarities between implied warranty of merchantability and strict liability causes of action. While these causes of action are not exactly identical, these cases have determined that the existence of a defect in a product is a necessary requirement to prevail under either theory. See *Nave*, 123 Ill. App. 3d at 592-93; *Livingston Service*, 96 Ill.

App. 3d at 593; *141 South Main*, 49 Ill. App. 3d at 727.

Because we have determined that this case must be reversed due to the inconsistent verdicts, we need not address defendant's other contentions on appeal. Furthermore, our disposition on this issue also makes it unnecessary for us to consider plaintiffs' cross-appeals concerning the propriety of the trial court's ruling on the attorney fee petitions. See 15 U.S.C. §2310(d)(2) (1976) (fees and expenses can be awarded only if the "consumer finally prevails").

Finally, we note that we could have disposed of this matter on an issue not presented by the parties. We are hesitant to deprive the litigants of an opportunity to present argument. Therefore, we have not decided this matter on the issue of the necessity of privity in a situation where there is only property damage. Although not raised on appeal (but raised in a motion to dismiss which the trial court denied), it appears that the cause of action based on implied warranty does not lie here because there is no privity of contract. Our supreme court has not extended the personal injury exception to the requirement of privity to contract actions which only allege property damage. (*Board of Education v. A, C & S, Inc.* (1989), 131 Ill. 2d 428, 460-61.) If, as it appears, no cause of action exists, all of the issues raised as to the implied warranty count would fail. We could have overlooked the waiver of this issue in this particular situation as it involves a pure question of law. (*Hux v. Raben* (1967), 38 Ill. 2d 223, 225.) However, we are very reluctant to address an issue which the parties themselves have not raised, and we elect not to do so in this case, although we call to the attention of the parties this significant legal question. We also note that the result would not change if we were to decide this case on the privity issue.

For these reasons, the judgment of the circuit court of Kane County upholding a jury verdict in favor of plaintiffs on the breach of warranty of merchantability count is reversed. The court's orders denying plaintiffs attorney fees and expenses are affirmed.

Affirmed in part; reversed in part.

GEIGER, J., concurs.

JUSTICE REINHARD, specially concurring:

The judgment of the circuit court should be reversed but upon a different basis than the analysis contained in the majority opinion.

Plaintiff's cause of action in the amended complaint sought recovery in count I on a strict liability in tort theory and in count III on a

breach of the implied contractual warranty of merchantability theory. The implied-warranty count was based on section 2—314 of the Uniform Commercial Code (UCC) (Ill. Rev. Stat. 1985, ch. 26, par. 2—314) and sought property damages and recovery for loss of use of real estate and personal property resulting from a fire. It is apparent from a reading of the implied-warranty count that plaintiff sought recovery against defendant as the manufacturer of the extension cord and not as the immediate seller of the extension cord to its subrogor.

In the trial court, defendant filed a motion to dismiss count III on the basis that there was no privity of contract between plaintiff (who at the time was the subrogor) and defendant. The motion was denied in the trial court. This issue has not been raised by defendant on appeal. Nevertheless, because it is the responsibility of the reviewing court for a just result and for the maintenance of a sound and uniform body of precedent, this court may sometimes override the considerations of waiver that stem from the adversary character of our system and decide a case on a ground not raised by the parties. (*Hux v. Raben* (1967), 38 Ill. 2d 223, 224-25; see also *Schutzenhofer v. Granite City Steel Co.* (1982), 93 Ill. 2d 208, 210-11; *Champaign National Bank v. Landers Seed Co.* (1990), 194 Ill. App. 3d 1019, 1022-25.) In the case at bar, the issue is one of law, and the precedent is clearly established by a decision of our supreme court. I, therefore, believe this is one of those cases where the waiver rule should be relaxed, although normally I agree the waiver rule should apply where the parties have not briefed an issue which the reviewing court could find dispositive of the appeal. Should defendant wish to challenge the legal basis on which I would decide the case, it may do so in a petition for rehearing.

In *Board of Education v. A, C & S, Inc.* (1989), 131 Ill. 2d 428, the court held that, where the complaint alleges only that there has been property damage in a contract action based upon breach of implied warranties, plaintiffs must allege privity of contract with the defendant to state a cause of action. (131 Ill. 2d at 461-62.) It is evident from the pleadings and the proofs at trial that plaintiff is not in privity with the defendant herein, which is the manufacturer of the extension cord. Thus, this is the proper basis on which this appeal should be decided. As no cause of action in contract for breach of the implied warranty of merchantability lies, the judgment of the circuit court on this count must be reversed.

The error in proceeding on this improper count is compounded by this court's failure properly to separate the strict liability count and the implied warranty of contract count in reviewing the use of the special interrogatory. The special interrogatory is clearly one which, by its

language, is applicable only to the strict liability count. It reads as follows: "[d]id a defect or defects exist in the extension cord when it left the manufacturer's control which made the extension cord unreasonably dangerous?" Consequently, in applying the answer to the special interrogatory as well to the verdict for plaintiff in the implied warranty contract action, the majority has blurred the distinction in the issues and elements to be proved in a contract action based on implied warranty of merchantability and a tort action in strict liability.

The majority cites one line of cases to establish the proposition that the " 'strict liability theory is essentially the liability of implied warranty divested of the contract doctrines of privity, disclaimer and notice.' " (*Nave v. Rainbo Tire Service, Inc.* (1984), 123 Ill. App. 3d 585, 592-93, quoting *Dunham v. Vaughan & Bushnell Manufacturing Co.* (1967), 86 Ill. App. 2d 315, 333, *aff'd* (1969), 42 Ill. 2d 339; *Livingston Service Co. v. Big Wheels, Inc.* (1981), 96 Ill. App. 3d 591.) From this, the majority concludes that a plaintiff must prove that a "defect" exists in a product before recovery can be had under either theory. The line of cases emanating from *Dunham*, however, does not deal with the precise question of whether a condition which renders a product unmerchantable is legally identical to a condition which would render a product unreasonably dangerous. While strict liability in tort may closely resemble its ancestor, the common-law implied warranty, it is different from the entirely contractual implied warranties recognized today under the UCC. See *Board of Education v. A, C & S, Inc.* (1989), 131 Ill. 2d 428, 439-51, 460-63.

The majority rejects the conclusion of the court in *Malawy v. Richards Manufacturing Co.* (1986), 150 Ill. App. 3d 549, 560, that "a 'defect' in a product is not required to be established to sustain liability for the breach of an implied warranty." Although the majority rejects *Malawy*, it commits the same error displayed in that case when it attempts to ascribe inherent legal meaning to the term "defect." *Malawy* states that the "theory of strict liability in tort imposes liability upon the manufacturer of goods only if there was a 'defect' when they left the manufacturer's control." (*Malawy*, 150 Ill. App. 3d at 559.) In point of fact, proving just the existence of a "defect" in a product is not sufficient for recovery under either strict liability or breach of the implied warranty of merchantability. While a product might, under either theory, be termed "defective" in a generic sense, this is not a term of art giving rise to legal equivalency between the causes of action merely because both deal with "defective" products. The comments to section 402A state that the rule of strict liability "applies only where the *defective* condition of the product makes it *unreason-*

*ably dangerous* to the user or consumer." (Emphasis added.) (Restatement (Second) of Torts §402A, comment *i*, at 352 (1965).) Thus, a product might be termed "defective" and still not rise to the level of being unreasonably dangerous. See *McCracken v. Westinghouse Air Brake Co.* (1981), 103 Ill. App. 3d 26, 30 (defect breaches a strict liability duty only if users of the product are exposed to an unreasonable risk of harm).

Similarly, section 2—314 of the UCC (Ill. Rev. Stat. 1989, ch. 26, par. 2—314), which establishes the implied warranty of merchantability on which plaintiff's contract claim is based, does not define a breach in terms of whether a product is "defective." Instead, section 2—314(2) sets out six separate tests of merchantability, including the requirement that goods be "fit for the ordinary purposes for which such goods are used." (Ill. Rev. Stat. 1989, ch. 26, par. 2—314(2)(c).) Thus, *Malawy* is correct, in part, in holding that an alleged breach of the implied warranty of merchantability must be examined not by the term "defect," but by whether the product fails to meet one of the criteria set out in section 2—314(2). *Malawy*, 150 Ill. App. 3d at 560.

Accordingly, I believe that the majority incorrectly determined that the negative response to the special interrogatory precludes recovery based on breach of the implied warranty of merchantability. However, because I believe that the absence of privity between the parties defeats any recovery for breach of the implied warranty, I concur in the result reached by the majority.